[Civil No. 2895. Filed June 7, 1930.]

[288 Pac. 1029.]

WHITE RIVER SHEEP COMPANY, a Corporation, and E. H. DUFFIELD, Appellants, v. W. A. BARKLEY and C. S. STEWARD, Appellees.

Messrs. Dougherty & Dougherty and Mr. G. A. Rodgers, for Appellants.

Messrs. Silverthorn & Van Spanckeren, for Appellees.

ROSS, J.—The principal questions presented by this appeal relate to the sufficiency of the evidence and the measure of damages.

The plaintiffs are the lessees from the state of Arizona of ten and one-half sections of unfenced grazing lands, situate in Pinal county and south of Superstition Mountains. These lands are in compact form, two sections deep north and south and respectively five and five and one-half sections long east and west. Upon them grow wild grasses and herbage useful for stock feed. These sections constitute a part of plaintiffs' cattle range and are more particularly designed and kept for a winter range upon which plaintiffs place and locate from four to five hundred head of cattle in the fall of each year for feeding and fattening for the spring market. The defendant sheep company has leased from the state twenty-five sections of land, just south of plaintiffs' range, which are used as a sheep range during the winter months, beginning in December and extending to some time in May of each year.

On March 20, 1924, plaintiffs filed their complaint seeking an injunction restraining defendants from trespassing upon their said leased lands and for damages to "said land by said trespass in that said sheep did feed, pasture and browse upon the herbage and grass thereon growing, and did taint said pasturage so as to render the same unfit for the use of the cattle of plaintiff, and did destroy and injure the same by cutting the same with the hoofs of said sheep, to plaintiffs' damage in the amount hereinafter

stated, as nearly as such damages can be estimated.'' The damages alleged are $2,000.

The case was tried before the court and a jury. The damages assessed by the jury were $2,000 and judgment was entered for that amount against the sheep company and Duffield.

At the close of plaintiffs' case and at the close of the whole case defendants moved for an instructed verdict upon the ground that there was no damage proven and upon the ground of a variance between the allegations of the complaint and the proof. This motion was denied and among the fifteen assignments of error, two are directed at the court's ruling denying such motion. We think the disposition of the points made by these two assignments, and the assignment as to the measure of damages, will decide the case and for that reason the other assignments will not be stated or noticed, at least for the present.

It will be noticed that the complaint confines the claim for damages to the injury to the land and the injury to and destruction of the herbage and grass growing on the land. Since the plaintiffs were the lessees of the lands and entitled to its possession for grazing purposes only, any damage thereto would not be to their estate but to that of the owner (17 C. J. 894, § 194) and we will therefore construe such averments as a claim for the eating and destroying of the pasturage. Damages to property or person are either general or special.

"General damages are such as the law implies and presumes to have occurred from the wrong complained of.'' 17 C. J. 712, § 20.

"Special, as contradistinguished from general, damages are those which are the natural but not the necessary consequence of the act complained of. They are such as actually result from the commission of the wrong, but are not such a necessary result that they will be implied by law.'' 17 C. J. 715, § 42.

If a party would claim special damages or damages not implied or presumed from the injury, the rule is he must in his pleading inform his adversary of such claim of special damages and of what they consist. *City of Pueblo* v. *Griffin,* 10 Colo. 366, 15 Pac. 616. Plaintiffs claim in their complaint only general damages, and that they are entitled under such claim to be compensated for the loss they sustained by reason of defendants' sheep eating and destroying their pasturage, we think goes without saying. Just how that compensation should be arrived at is the difficulty. It is said:

"Definite rules which will measure the extent of recovery in all cases even of a particular class are difficult to formulate owing to the consideration which must be given in each case to its specific and perhaps peculiar surrounding circumstances. Stated in broad terms, however, the measure of damages is such sum as will compensate the person injured for the loss sustained, with the least burden to the wrongdoer consistent with the idea of fair compensation, and with the duty upon the person injured to exercise reasonable care to mitigate the injury, according to the opportunities that may fairly be or appear to be within his reach. . . . '' 17 C. J. 844, § 166.

Our examination of the cases wherein damages have been sought and allowed for the destruction of native forage impresses us that no exact rule for the measure of such damages, for very obvious reasons, has been stated. The rule for measuring damages to those kinds of crops that are planted and harvested and sold in the market is not the proper rule. Fruits and vegetables and different kinds of grain have a market value because they are bought and sold and dealt with as merchandise, and damages to such farm products may well be computed on the basis of their market value at the time of their destruction or an injury thereto. They not only have a market value

but their yield per acre in crates, bushels, pounds, tons or bales for any given season may be reasonably estimated.

"Verdure used for grazing purposes cannot be cut, stacked, and marketed by the ton or bale. It has no such market value. . . . As the stock consumes the grass, the shoots spring up repeatedly, and the crop is thus renewed." *Miller & Lux* v. *Pinelli*, 84 Cal. App. 42, 257 Pac. 573, 575.

In the last case the court adopted as the measure of damages for the appropriation or destruction of pasturage, it appearing that the grass could not be harvested or marketed, the reasonable rental value of the land in the vicinity for pasturage purposes. The rule declared is not the one generally adopted by the courts in the states having lands used for range purposes only. It has been said that where the pasturage is destroyed by flood or fire, the measure of damages is the value of the crop at the time and place of destruction, or if it had no market value, then its value in view of the use to which it was applied. *San Antonio, U. & G. Ry. Co.* v. *Ernst*, (Tex. Civ. App.) 210 S. W. 603. In another case it is said:

" . . . if there is no market value, then the recovery should be for the reasonable value of the grass for the purposes for which it is being used or for which intended. Any other rule would result in uncertainty." *Chicago, R. I. & G. Ry. Co.* v. *Word*, (Tex. Com. App.) 207 S. W. 902, 903.

Another court has said:

"The measure of damages was the reasonable value to the plaintiff of the grass or pasturage eaten or destroyed by defendant's sheep, together with the injury, if any, to the freehold." *Pacific Livestock Co.* v. *Murray*, 45 Or. 103, 76 Pac. 1079, 1080.

Again, in *Cleary* v. *Shand*, 48 Utah 640, 161 Pac. 453, the rule is stated, in syllabus three, as follows:

"Where grass or meadow has been eaten, injured, or destroyed, its value for hay or grazing purposes may be shown, and also, if the roots have been destroyed the cost of reseeding and restoring the field or meadow and the loss of the hay or pasture sustained in the meantime."

We think the just, fair and equitable rule in an action to recover for range pasturage destroyed, injured or consumed by trespassing animals in charge of herders, is its value for pasturage to the owner thereof. If all the lands in the vicinity had the same water facilities and the same feed in kind and quantity, the reasonable rental value of the land might very well be a proper criterion for estimating the damages, but it is well known that such is not the condition in this state. Watering places are scarce and often far between in the semi-desert parts of this country. The availability of native grass and herbage for stock purposes depends upon its proximity to permanent water for stock. As one witness said, in speaking of plaintiffs' watering place:

"They (the cattle) are located at that water and they radiate from out there and come back for water."

While defendants' proof was to the effect that their sheep did not eat and consume plaintiffs' grass, or if they did it was with plaintiffs' consent, there was an abundance of evidence that they did, against plaintiffs' protest, consume the grass, and the jury so found. That the plaintiffs were damaged, we take it, is established. But it is said no damages were proven. By this assertion we understand the contention to be that the evidence of damages was so indefinite, uncertain and speculative in its nature as to furnish no reliable or reasonable basis to the jury upon which to make its calculations. The evidence

in the record relied upon by plaintiffs to support the verdict and judgment we quote.

W. A. Barkley, one of the plaintiffs, testified:

"Q. How many—you say you ordinarily fattened about 300 steers and 100 cows, approximately, upon that place? Would that ordinarily furnish sufficient feed for your purpose? A. Yes.

"Q. And what was that worth per head for that feeding and fattening and conditioning, for market? A. It would have been worth ten dollars a head. . . .

"Q. Have you estimated the amount of difference in money by reason of the sheep feeding off this ground? A. About $20.00 per head on the valuation of cows.

"Q. How many head? A. Three hundred steers and one hundred cows. . . .

"Q. That wasn't the question. I am asking you as pertaining to this particular question, how do you arrive at that estimate of $20.00 per head? A. Well, I get $20.00 for a feeder steer, and I can get $40.00 for a fat steer of the same age, that is the way I figure it."

Charles Weeks, in behalf of plaintiffs, testified:

"Q. What percentage of them (400 head), would you say, would have been fattened? A. Oh, I would say 50 per cent. of them would have got fat. . . .

"Q. The cattle that Mr. Barkley moved on to the leased land in the fall of 1923 for the purpose of fattening and feeding and fitting them for market, do you know what the average weight of those were when he moved them on? A. No, I don't. They weren't weighed, or anything like that, no I can't say that I know the average weight of them.

"Q. Do you know about the average weight of them, the ages? A. Well, they were yearlings and twos, the yearling steers that he had up there to sell would be 12 months old.

"Q. The yearling steers weighed an average of how much? A. The average in that country, they average year after year less than five hundred, probably 450.

"Q. And the two year olds, what is the average of those? A. Well, I could not state, probably 550.

"Q. The three year olds? A. They would probably be 100 pounds more.

"Q. Now, the cows that he had over there for the purpose of feeding, what was the average weight of those? A. About 600 pounds, between six and seven hundred pounds.

"Q. Now, that is on the basis of feeding? A. Yes.

"Q. How much would the average fat yearling weigh? A. The average fat yearling would probably weigh between 750 and 800, if he was big and fat.

"Q. And the average fat three year old? A. He would weigh one thousand.

"Q. One thousand? A. That is a real average.

"Q. The average three year old? A. A lot depends on the size.

"Q. I am speaking of these cattle of Mr. Barkley's. A. Well, they weighed, two and three year olds averaged about a thousand pounds when they were fat.

"Q. And the average fat cow of Mr. Barkley's what would that weigh? A. About 900 pounds."

This witness also testified that fat cattle sold for two cents more per pound than feeders.

Mrs. Gertrude Barkley, on behalf of plaintiffs, testified that the cattle were sold as feeders in the spring of 1924:

"Q. Do you know, Mrs. Barkley, what the difference in money was between feeder cattle and beef cattle, in the spring of 1924? A. Yes, sir. . . .

"Q. And what was that per head? A. Well, I don't know that I could tell just exactly what it would be, but it would be the difference in the price from feeders to beef cattle, and the added weight that the beef cattle would put on to them, which always goes about $20.00 a head.

"Q. And in pounds, per pound what was the difference between feeder cattle and beef cattle at that time? A. Well, they usually call it about two cents a pound. . . .

"Q. Do you know whether or not four to five hundred head of cattle had been converted from feeders

into beef cattle on this leased land between the, say December and March, the following March, under the climatic conditions as to rainfall, were the same in the fall of 1923 and the spring of 1924? A. Well, I would not say that many, but I would say that a big percentage of them would make beef.

"Q. What do you mean by 'big percentage,' about how many? A. Well, I would say probably more than half of them."

It appears that some of plaintiffs' cattle were sold as feeders in the spring of 1924, but the number so sold and the price realized are not given. The loss estimated by the different witnesses is not based upon a comparison of the prices actually realized in the spring of 1924 for beef cattle with that realized for feeders of the same age, size and kind. Such comparison might have been made, for it appears plaintiffs sold that spring from another part of their range some beef of the same stock. It is very improbable that the loss of each head of the four hundred cattle, yearlings, two year olds, three year olds, and cows, would have been the same or that, as the witnesses state, they would have sold for $20 as feeders and $40 as beef. Whether the feed of which the cattle was deprived would have, if eaten by them, put $10 or $20 worth of flesh on each one of them is of course problematical. It is clear that the estimates of damages are not based upon cattle of diversity of age, size and sex as the plaintiffs' were, but upon an ideal or imaginary conception. The damages, if any, sustained by the cattle would not be any more uniform than the plaintiffs' herd, which were anything but uniform in size, age and sex. In effect, the evidence is that plaintiffs were deprived of making $20 per head on cattle because of defendants' trespass. What other courts have thought of such evidence as a basis of damages follows.

In *Chicago, B. & Q. R. Co.* v. *Gelvin,* (C. C. A.)
238 Fed. 14, 19, L. R. A. 1917C 983, the court gave
a general summary of the evidence to prove damages
to cattle as follows:

"There was other testimony of expert cattle feed-
ers, corroborating the estimates as to the amount of
flesh these cattle would and should have put on
under the conditions under which they were fed, if
there had been no fire, and also testimony supporting
the testimony of the plaintiff that the entire herd of
cattle sold in a different classification than they would
if they had taken on this extra flesh more than they
did, and that they sold for a price of more than $1.50
per hundredweight less than they would if they had
put on the additional flesh, and thereby had been sub-
ject to classification with the heavier cattle, and that
the plaintiff, therefore, was damaged on every hun-
dredweight of cattle that he sold, the difference be-
tween what they did sell for and what it was alleged
they would have sold for if they were heavier."

And then said:

"The alleged damage to the cattle, through failure
to take on flesh, consequent loss of profits by reason
thereof, the fact that heavier cattle sold for more than
light cattle at Chicago some months subsequent to the
fire, the price received for these cattle at that time and
place, in the absence of anything like definite proof
that even if the cattle did not take on as much flesh
as it was thought by the owner and others that they
should, that this was caused solely by reason of any
injury sustained by the cattle as a direct consequence
of the fire, are uncertain, conjectural, and purely
speculative, and in our judgment the jury should not
have been permitted to consider either of these ele-
ments in the ascertainment of the value of the cattle
in the pasture . . . after the fire."

In *Sussex Land & Live Stock Co.* v. *Midwest Re-
fining Co.,* (D. C.) 276 Fed. 932, 944 (affirmed in
[C. C. A.] 294 Fed. 597), the effort of plaintiff was
to prove that, by reason of its being deprived of its

pasturage for sheep and cattle by defendants' tres-. pass, it lost certain profits it otherwise would have made, the court said:

"I cannot conceive of any class of testimony which would bring the proof of damage more within the realm of speculation than does this class. It is a matter of common knowledge that success in business, and thereby the derivation of profits therefrom, depends upon many varying circumstances. Some of the constituent elements of this success in the class of business being considered in this case must be the business acumen of the principal; the market price of stock to be sold; the quantity and quality of pasture available to the business, both as to owned lands and outside lands used for grazing purposes; the quality of the stock raised; loss through the elements or other unfortunate circumstances; loss through disease; the condition of the labor market; the efficiency of labor; and the attention or lack of attention of the owner to his business. All these elements make for success in any business."

In *Central Coal & Coke Co.* v. *Hartman*, (C. C. A.) 111 Fed. 96, 98, it is said:

"Compensation for the legal injury is the measure of recoverable damages. Actual damages only may be secured. Those that are speculative, remote, uncertain, may not form the basis of a lawful judgment. The actual damages which will sustain a judgment must be established, not by conjectures or unwarranted estimates of witnesses, but by facts from which their existence is logically and legally inferable. The speculations, guesses, estimates of witnesses, form no better basis of recovery than the speculations of the jury themselves. Facts must be proved, data must be given which form a rational basis for a reasonably correct estimate of the nature of the legal injury and of the amount of the damages which resulted from it, before a judgment of recovery can be lawfully rendered. These are fundamental principles of the law of damages."

We are reluctantly brought to the conclusion that the evidence of loss submitted by the plaintiffs was too indefinite, uncertain and speculative for the basis of a judgment for damages.

The rule of damages we have heretofore stated. The admissible evidence thereof is the opinion of men qualified by experience to speak about such matters. *Galveston, H. & S. A. Ry. Co.* v. *Rheiner*, (Tex. Civ. App.) 25 S. W. 971; *Gulf, C. & S. F. R. Co.* v. *Matthews*, 3 Tex. Civ. App. 493, 23 S. W. 90; *San Antonio, U. & G. Ry. Co.* v. *Ernst, supra; Pacific Livestock Co.* v. *Murray, supra; Cleary* v. *Shand, supra; Brown* v. *McCloud*, 96 Or. 549, 190 Pac. 578

It is true, as contended by defendants, that the damages alleged in the complaint are to the grass and herbage and not to the cattle of plaintiffs, and, if the evidence of damage or loss to the cattle had been objected to when offered, it would have been error to admit it. Most of the testimony as to the damages or loss to cattle, however, was admitted without objection and if it had possessed the quality of reasonable certainty required by the law, the objection now made, that it was at variance with the allegations, would be not only unavailing but too late.

The court, after hearing the evidence and after the return of the jury's verdict, entered judgment permanently enjoining defendants from herding, driving or pasturing their sheep upon plaintiffs' land. Defendants claim that it was error to enter such judgment because the evidence conclusively shows that defendants had, before suit was filed and before being served with temporary restraining order, removed all sheep from plaintiffs' premises with the intention of keeping them off the same thereafter. There was evidence, however, on the part of the plaintiffs that the sheep of defendants were kept and herded on premises from December of 1923, to March of 1924,

62

and were not removed from the premises until after defendants were served with process. If the facts were as contended by defendants, the permanent injunction should not have been issued (32 C. J. 45, § 24), but if as contended by plaintiffs, it was not improperly granted. 32 C. J. 46, § 25; *Matthews* v. *Chambers Power Co.*, 81 Or. 251, 159 Pac. 564; *Thrasher* v. *Hodge,* (Mont.) 283 Pac. 219; *Musselshell Cattle Co.* v. *Woolfolk,* 34 Mont. 126, 85 Pac. 874. It was for the trial court to determine with which the truth lay. We are of the opinion, however, that the motion for a directed verdict for a lack of legal evidence of any damages should have been granted.

The judgment is reversed and the cause remanded, with directions that a new trial be granted on the issue of damages only, plaintiffs to have costs of lower court, and defendants costs of this court.

LOCKWOOD, C. J., and McALISTER, J., concur.