GIBSON *v.* LEE WILSON & COMPANY.

4-8094                                        200 S. W. 2d 497

Opinion delivered March 17, 1947.

*James B. Roleson, J. F. Gautney, John F. Gautney, Jr.,* and *Ivie C. Spencer,* for appellant.

*Chas. D. Frierson* and *Charles Frierson, Jr.,* for appellee.

Ed. F. McFaddin, Justice. A suit filed in the chancery court—by the Bank of Wilson to recover judgment against appellant and appellee, and to foreclose a crop and chattel mortgage—has been converted into a damage suit between the appellant and the appellee who were defendants below; and thus reaches us on appeal and cross-appeal: appellant claiming the damages (awarded by the chancery court) are too small, and appellee claiming there should be no damages. The facts are complicated, and the evidence is in hopeless conflict.

## FACTS

On March 6, 1944, the appellee, Lee Wilson & Company (a trust estate acting by J. H. Crain, trustee), and

hereinafter referred to as "Wilson," entered into a lease agreement with appellant, W. I. Gibson, as follows:

"LEASE AGREEMENT

"This lease agreement made and entered into by and between Lee Wilson & Company, of Wilson, Arkansas, lessor, and W. I. Gibson of Cash, Arkansas, lessee.

"1. Lessor hereby leases unto the lessee rice land located in Craighead county, Arkansas, for a term beginning January 1, 1944, and ending December 31, 1944, for agricultural purposes only. The terms of rental shall be as follows:

"2. Lessor agrees to furnish 200 acres of land suitable for growing rice, described as follows: East 200 acres of E½ section 18-13-2.

"3. Lessor agrees to equip said land with a suitable irrigation plant, either electric or power unit, said plant to have sufficient capacity to properly irrigate the above stated acreage of rice.

"4. Lessor agrees to furnish 50 per cent. the cost of electricity or fuel oil for irrigation purposes. Lessee to furnish all the rest necessary.

"5. Lessor agrees to furnish all the cost of seed rice and will secure the rice seed to be planted on the above described land.

"6. Lessee agrees to furnish all labor, machinery, oil, and twine to plant, cultivate, harvest and thresh said rice crop and all other labor necessary to produce the crop. Lessor agrees to pay one-half the cost of rental on thresher and agrees to buy his own sacks if that becomes necessary.

"7. Lessor shall receive one-half of all crops grown on the above described land, and lessee shall receive the other one-half.

"8. Lessee will, at all times, expedite his farming operations and the planting, cultivating, irrigating and harvesting of crops as to reasonably insure proper re-

sults; and should he fail or refuse to properly perform the duties at the proper times, or fail or refuse to comply with the other provisions of this agreement, then first party shall have the right to take immediate possession of said lands and premises, and to plant, cultivate, irrigate and harvest the crops, and do such other work in connection therewith as lessor may deem proper. All work done by lessor shall be a direct charge against the one-half interest ordinarily due lessee.

"9. Lessor shall at all times have ingress and egress over the above described premises.

"10. Lessee agrees to deliver after threshing, to the nearest shipping point or mill at Jonesboro, Arkansas, (or elevator or granary in the event an elevator or granary is installed on or near the above described lands), rice grown on the above described lands and belonging to lessor, and also that on which lessor has lien.

"11. It is further agreed between the parties that the lessee shall at his own expense, mow or cut and burn the weeds, grass and other growth along the fence rows, roads, ditch and canal banks contingent to the rice field, and this shall be done at least once, and if necessary twice, during the crop season, in order to prevent said weeds and other growth from going to seed.

"12. It is further agreed that in the event it is necessary to pull or pick noxious weeds or other growth other than excessive growth of water grass, then the expense of this special work shall be borne equally by the parties hereto.

"13. It is agreed that while this contract is entered into in good faith between the lessor and the lessee, in the event that conditions develop which are beyond human control, such as the securing of pumps or electricity or a power unit or the Government's withdrawal of prisoner of war labor now engaged in clearing land, or any other thing or item beyond the control of either party hereto, then this contract shall be automatically voided as a whole or in part. And in the event lessee has expended monies

in preparing land, in planting the seed, or has done any other work in preparing lands, then the lessor shall reimburse the lessee to the full amount of such expenses by the lessee.

"14. Lessor will loan to the lessee an amount of money equivalent to $20 per acre contracted for to help lessee in his operations. Lessor retains landlord's lien for rent and all loans or advancements and on demand shall execute a chattel mortgage on any chattels where necessary or advisable in addition to landlord's lien. Advances on loans will be made monthly during season as needed."

Under § 14 of the aforesaid agreement Wilson was to loan Gibson $20 per acre to finance the crop. Instead of making the loan direct to Gibson, Wilson, on March 28, 1944, signed Gibson's note to the Bank of Wilson (hereinafter called the Bank) for $4,000. Then on October 26, 1944, Gibson obtained from the Bank $250 additional to pay part of the harvesting expenses. Both notes were secured by crop and chattel mortgages executed by Gibson to the Bank under date of April 1, 1944.

Gibson planted, cultivated and harvested a rice crop on about 160 acres of the land, and delivered to two rice mills (Jonesboro and Arkansas Cooperative) a total of 3,680.88 bushels of rice. The time and manner of planting, cultivating and harvesting the rice constitute sharply disputed matters and will be discussed in the opinion. At all events Gibson held certain uncashed checks (to himself and Wilson), but had neither paid the rent to Wilson nor delivered the checks to the Bank when this suit was filed.

On June 8, 1945, the Bank filed this suit against Gibson, Wilson and the two rice mills seeking (a) judgment for $4,250 and interest on the notes, (b) foreclosure of the crop and chattel mortgage, and (c) accounting as to the proceeds of the rice crop. On the same day (and that is significant), Wilson filed answer to the Bank's complaint and a cross-complaint against Gibson for Wilson's

part of the crop rent. On July 5, 1945, Gibson answered the Bank's complaint and Wilson's cross-complaint and also cross-complained against Wilson on these items: (1) that Wilson had delivered to Gibson only 160 acres for farming instead of 200 acres, and the damages of $2,256 were claimed for this deficiency in acreage; and (2) that Wilson breached paragraph 3 of the lease agreement (regarding furnishing of water for irrigation), and damages of $10,264 were claimed for this breach. To this cross-complaint Wilson filed answer and thus issue was joined between Gibson and Wilson. So far as the Bank was concerned, no one seriously denied its rights; and Gibson and Wilson (by stipulation to prevent prejudice) deposited with the Bank $4,574.19, which lacked only $40.21 of paying the Bank in full. This money deposited with the Bank represented checks from the two rice mills, which were part of the proceeds of the Gibson rice crop.

The trial in the chancery court resulted in a judgment (1) awarding the Bank of Wilson the $4,574.19 on deposit, and judgment against Wilson for the balance of $40.21 and all costs; and (2) decreeing such award and judgment to be complete satisfaction of all claims of the Bank against Gibson on the note and chattel mortgage and also (3) decreeing such payment to be full settlement of all claims of Gibson against Wilson and Wilson against Gibson. The net result of the decree was to allow Gibson damages against Wilson in a sum equal to Wilson's total rent in the rice crop that Gibson produced, plus the $40.21 required to pay the balance of the Bank's note.

From the decree of the chancery court, Gibson has appealed as against Wilson, and Wilson has appealed as against Gibson. Appellant Gibson claims the decree is erroneous because it fails to award him sufficient damages for land deficiency and irrigation deficiency. Appellee Wilson claims the decree is erroneous because it allowed appellant damages to which he was in no wise entitled and thereby deprived appellee of rents.

## OPINION

We discuss the issues under suitable topic headings.

I. *Appellant's Contention as to Land Deficiency.*
The lease agreement stated that lessor (appellee) would
furnish "suitable for growing rice" the east 200 acres of
the east half of section 18. Appellant claims that he was
only furnished 160 acres, and was damaged by the appel-
lee's failure to furnish the entire 200 acres. The chan-
cery court disallowed this contention of the appellant;
and we affirm the chancery court.

The preponderance of the evidence shows that the
appellant received the land agreed to be furnished, and
that the parties understood the land by reference to
drainage ditches and physical monuments, rather than by
reference to the land description contained in the written
instrument. If Gibson had received the east 200 acres of
section 18, he would have cultivated a strip 550 yards wide
—east and west—along the entire east side of section 18.
But the proof shows that Gibson intended to receive and
did utilize a strip that was more than 880 yards wide—
east and west—at one point, and considerably more than
550 yards wide—east and west—at other places. A map
—introduced in evidence without objection—showed (a)
a drainage lateral on the entire east side of section 18,
and (b) a bayou which entered the west half of section
18 from the south, and extended northeast in an irregular
course to the approximate center of the northeast quarter
of section 18, and then divided into two forks, one going
northwest and the other northeast. The proof shows that
Gibson intended to receive and did utilize the land in sec-
tion 18 that lay west of the drainage lateral and south
and east of the bayou, and that some of this land extended
over into the west half of section 18. The land that Gib-
son utilized appears to be approximately 170 acres.

The shape of the tract of the land that Gibson utilized
is so at variance with the description of the land as con-
tained in the lease, that it must be presumed that the
parties misdescribed the land in the lease. Gibson makes

no contention that he received land *other* than what he was to receive. His sole contention is that he did not receive *all* the land that he was to receive. Cooksey, a witness called by Gibson, testified that Gibson never made any complaint to him about not getting the land he contracted to receive; and Meyer, a witness called by appellee, testified that Gibson was satisfied with the tract he actually received and put into cultivation.

From all the evidence in the record we conclude (a) that Gibson received the land actually intended by both parties, and (b) that the description in the lease was not only a mutual mistake, but was reformed and corrected by the conduct of all parties, and (c) that the evidence is sufficient to support such actual reformation of description. See *Cherry* v. *Brizzolara,* 89 Ark. 309, 116 S. W. 668, 21 L. R. A., N. S. 508; see, also, cases collected in West's Arkansas Digest ''Reformation of Instruments,'' § 13 and § 19; and see 45 Am. Jur. 604.

II. *Appellants' Contention as to Irrigation Deficiency.* Under paragraph 3 of the lease agreement Wilson agreed to furnish an irrigation plant with ''sufficient capacity to properly irrigate'' the rice acreage. The overwhelming preponderance of the evidence is to the effect that Wilson breached this provision in the contract. The chancery court so found, and we affirm the finding.

Gibson completed planting his rice crop on May 15th —agreed by all to be the correct time for such completion. The rice was four inches high on June 4th, and should have been irrigated on that date, and certainly not later than *June 12th.* Yet, sufficient water was not obtained for irrigation until after *July 12th*; and this delay caused severe damage to the rice crop. Against this claim for damages, appellee interposes two defenses: (a) that Wilson was honestly trying all the time to get the required irrigation plant into operation and was prevented by unfortuitous circumstances, and (b) that on account of the war and other unavoidable casualties Wilson is enti-

tled to relief under § 13 of the lease agreement. We notice these defenses:

As regards (a)—"honest effort"—no amount of such evidence can justify Wilson's breach of the positive agreement to furnish sufficient irrigation. In *Harrington* v. *Blohm,* 136 Ark. 231, 206 S. W. 316, the landlord, in leasing land to the tenant for rice production, agreed to furnish suitable irrigation. There, as here, the landlord sought to excuse the breach by showing an *honest effort* to perform and prevention by a variety of circumstances. We denied the landlord's defense, saying:

". . . it is argued that it could not have been contemplated that appellant would be required to do more than to make an honest effort, in good faith, to furnish the necessary pumping machinery, and that he had 'used his best endeavors to get said well and machinery installed before June 1, of said year, and that the failure to do so was no fault of defendant's.' But appellant did not contract merely to use his best endeavors. His contract was to install the machinery by June 1, and the agreed statement of facts recites the disastrous effects to the rice crop from a failure in this respect, and these consequences were necessarily in the contemplation of the parties when the contract was executed." See, also, *Ingham Lumber Co.* v. *Ingersoll,* 93 Ark. 447, 125 S. W. 139, 20 Ann. Cas. 1002; and *Kelley Trust Co.* v. *Zenor,* 159 Ark. 466, 252 S. W. 39. We shall again refer to this case of *Harrington* v. *Blohm,* as it is strikingly similar to the case at bar.

As regards appellee's defense (b)—war conditions, etc.: Wilson urged § 13 of the lease agreement as a defense against the deficiency in irrigation. This § 13 was quoted in full in the lease agreement in the statement of facts. The special chancellor, in his written opinion denying Wilson's defense on this point, said:

"Section 13 of the contract applies only to those conditions arising from circumstances beyond human control which would result in an automatic termination of

the contract, either in whole, or in part. I do not find that either party asked for, or attempted to invoke an automatic termination of the contract in any part at an appropriate time.''

We agree with the chancery court. This § 13 of the lease agreement is what is generally referred to as ''an-option-to-terminate clause.'' In *Wertheimer* v. *Citizens Bank Building Company,* 117 Ark. 50, 173 S. W. 841, and in *Citizens Bank Building Company* v. *Wertheimer,* 126 Ark. 38, 189 S. W. 361, Ann. Cas. 1917E, 520, we had occasion to consider a lease contract containing ''an-option-to-terminate clause.'' In Ann. Cas. 1916B, 306, there is an extensive note on option-to-terminate clauses. It is there stated (p. 310): ''An option to terminate a lease can be exercised only by complying with the provisions granting it.'' Cases are cited to sustain this state. ment. In 32 Am. Jur. 709, the rule is stated: ''Occurrence of and compliance with conditions and terms is prerequisite to the exercise of an option to terminate a lease . . .'' See, also, 35 C. J. 1052. In the case at bar the option-to-terminate clause required the lessor to reimburse the lessee for moneys expended, etc. The lessor did not pursue that procedure, but allowed the lessee to cultivate and harvest the crop. Claiming § 13, at this late date, appears to be a mere afterthought or a sort of ''grasping at a straw'' of defense. We, therefore, hold, as did the chancery court, that Wilson breached the contract in the matter of irrigation deficiency, and has presented no valid defense against such breach.

III. *The Damages Awarded Appellant.* We come now to appellant's contention that the chancery court's judgment (for damages) was too small, and to appellee's contention that the judgment was too large. As to the law on the measure of damages in a case like this, there is no uncertainty. *Harrington* v. *Blohm,* 136 Ark. 231, 206 S. W. 316, states the applicable rule, and is directly in point, because in that case the tenant recovered damages from the landlord who failed to furnish irrigation for a rice crop.

Before discussing the rule of *Harrington* v. *Blohm,* we dispose of some of the cases claimed by Wilson to modify that rule. They do not; because they deal with situations entirely different. *Morrison* v. *Weinstein,* 151 Ark. 255, 236 S. W. 585, involved the measure of damages claimed by a tenant kept out of possession of the land. *Layne-Arkansas Company* v. *Seeman,* 173 Ark. 1062, 294 S. W. 382, involved the damages claimed by a purchaser from a seller for alleged failure to repair a pump. It is obvious that the facts in these cases distinguish them from the case at bar.

*Harrington* v. *Blohm, supra,* held that when a landowner breaches his contract to furnish suitable irrigation for a rice crop and the tenant is damaged thereby, then the tenant's measure of damages is the tenant's part of the difference between (1) what the land would have produced if the irrigation had been furnished, and (2) what the land actually produced; deducting from this difference the amount it would have cost to produce, harvest and market the crop that would have been produced if irrigation had been furnished. That is the rule of *Harrington* v. *Blohm.* The same rule is stated in 30 Am. Jur. 629 in these words:

''Where a growing crop has been damaged as a result of failure to furnish sufficient water for irrigation purposes, it has been held that the measure of damages, in case of liability, should be the value of the crop which would have been raised had it been properly watered, or the grower's share thereof, less the value of the damaged crop, and what would have been the expense of raising, harvesting, and marketing such additional crop.'' See, also, Annotation in 108 A. L. R. 1174.

The question of the tenant's lack of due diligence in harvesting and marketing the crop actually produced was not mentioned in *Harrington* v. *Blohm* because there was no claim of lack of due diligence on the part of the tenant in that case. There is such a claim in the case at bar. Of course, it is the tenant's duty to harvest in a husband-like way the crop actually produced. This is an applica-

tion of the rule that the plaintiff must use due diligence to minimize his damages. See *Wisconsin & Ark. Lumber Co.* v. *Scott,* 167 Ark. 84, 267 S. W. 780, and *St. Louis S. W. Ry.* v. *Tucker,* 161 Ark. 140, 255 S. W. 553. In 15 Am. Jur. 426, the rule is stated:

"One deprived of the fruits of a contract must use the efforts of a reasonably prudent man to put himself in as good position as he would have been if the contract had not been violated. He must do nothing to aggravate his loss, but must do all he reasonably can to mitigate or reduce it. He cannot recover for that which he might reasonably have avoided."

The tenant cannot recover from his landlord damages from loss of the crop when such loss came about through the fault of the tenant. So, where it is shown that the tenant failed to use due diligence to harvest the crop actually produced, then he will be charged with what was lost occasioned by his lack of due diligence in harvesting. The tenant, in such case, would recover his part of the difference between (1) what the land would have produced if the irrigation had been furnished, and (2) what the land would actually have produced (without contracted irrigation) if the tenant had used due diligence in harvesting and marketing the crop actually produced; deducting from this difference the amount it would have cost to produce, harvest and market the crop that would have been produced if irrigation had been furnished as agreed.

So much for the rules of law: now for the application of these rules to this case. We quote from the opinion of the special chancellor:

"The raising of rice is unquestionably a hazardous undertaking. The determination of what amount might have been produced, or should have been produced, is an element of speculation, and something about which there can be no mathematical formula. Based on the experience of others in similar circumstances, however, courts and juries are permitted to reach a conclusion. It is my

opinion that the crop was damaged by failure to receive water at the proper time; that this damage consisted in part of making the maturity later than it would otherwise have been; that on account of the late maturity less rice was harvested than would have been if the crop had matured at the time it would have ripened had the field been irrigated at the early date that was desirable.

"The contract provided for lessor receiving 50 per cent. of the crop as rent. If the crop had produced twice as much as it did, or had amounted to $9,000, Lee Wilson & Company would have been entitled to $4,500 as rent. As it was, the crop lacked a small amount of paying for the cost of production. In view of the uncertainty about making and harvesting a rice crop, and especially that uncertainty which prevailed during 1944, as shown by the evidence in this case, I think a fair and equitable determination of this matter will be to let Lee Wilson & Company pay the balance of $40.21 due to Bank of Wilson, and the cost of the case, and recover nothing on its cross complaint for rent. I think this is fair to Mr. Gibson because I do not think the evidence would permit a finding that more than twice as much rice would have been harvested under the best possible performance by Lee Wilson & Company, and as above stated, with such additional crop the rent going to lessor would have consumed all of the additional return from the crop."

A large portion of the testimony in this record is concerned with (a) estimates of how many bushels of rice per acre would have been raised if the irrigation had been proper; (b) the cost of cultivating and harvesting a rice crop; (c) the late maturity of this crop due to irrigation deficiency; (d) the abnormal weather conditions existing in the harvesting season of 1944; (e) the equipment used by Gibson in harvesting and threshing his rice; and (f) Gibson's delay in, and suspension of, his harvesting operations and his refusal to accept aid for a more rapid completion. These are some of the factual forces that entered into the determination of the damages as decreed by the chancery court; and it is the interplay of these factors

that makes it impossible for us to say that the award of the chancery court is against the preponderance of the evidence. Gibson was guilty of delay and suspension in his harvesting operations, and we are unable to say how much his delay contributed to the loss of that part of the crop that was never harvested and marketed.

Since we are unable to say that the finding of the chancery court is against the preponderance of the evidence, we therefore affirm the case on both direct appeal and cross appeal. We adjudge that the costs of the appeal be divided equally between appellant and appellee.