446 P.2d 458

**COURY BROS. RANCHES, INC., an Arizona corporation, Appellant and Cross-Appellee,**

v.

**Kenneth L. ELLSWORTH and Doris Fay Ellsworth, husband and wife, Appellees and Cross-Appellants.**

No. 8524.

Supreme Court of Arizona.

In Division.

Nov. 1, 1968.

Snell & Wilmer, by Mark Wilmer, and Thomas E. Parrish, Phoenix, for appellant and cross-appellee.

Conway T. Ryan, Chandler, and Charles A. Filler, by Charles A. Filler, Phoenix, for appellees and cross-appellants.

STRUCKMEYER, Justice.

This action was brought by Coury Bros. Ranches, Inc., an Arizona corporation, against Kenneth L. Ellsworth and Doris Fay Ellsworth, husband and wife, for the unpaid balance due under a pasturage contract entered into with Kenneth L. Ellsworth. The Ellsworths admitted the execution of the contract, alleged a breach by Coury and counterclaimed for damages· arising out of the breach.

After the trial the jury in answer to interrogatories found that the Ellsworths suffered damages through loss of sheep as a result of the failure on the part of Coury to carry out the terms of the contract and that the amount of damages thereby suffered was $15,947.50. It also found that the Ellsworths were required to obtain other pasturage by reason of the breach and that the expenses so incurred were $3,869.25. Total damages were thus found to be $19,816.75. On the instruction of the court that any verdict in favor of the defendant was to be reduced by the sum of $5,000.00, the amount of the last payment due Coury on the contract, the jury returned a general verdict of $14,816.75 in favor of the Ellsworths.

The trial court, pursuant to Rule 59(i), Rules of Civil Procedure, 16 A.R.S. ordered a remittitur of $8,111.29, an amount the court believed excessive principally for asserted lamb losses. The remittitur was conditional in that, if the Ellsworths accepted, the Coury motion for new trial would be denied but if not accepted, a new trial would be granted limited to the question of damages for the lamb losses. The Ellsworths did not accept the remittitur.

Coury has appealed from the judgment entered on the jury's verdict and the order denying its motion for new trial as to the entire case. The Ellsworths have cross-appealed from the order granting a new trial on the issue of lamb losses damages and for the further reason that the court below erred in failing to award them reasonable attorneys fees.

The contract, as drafted by the office manager for Coury, provides:

## "CONTRACT AGREEMENT

"Kenneth L. Ellsworth, of 657 West Toledo, Chandler, Arizona, contracts with Coury Bros. Ranches, Inc., of 270 Valley National Bank Bldg., Mesa, Arizona, as of October 16, 1961, to pasture sheep on the following pastures of Coury Bros. Ranches at Magma, Arizona, as of this date to February 11, 1962:

"in Township 3S R8E, Sec. 9, the south one-half of Field #5–S and all of Field #6–S; also all of Field 1–N of Sec. 10; and also all of Field #14–S and 15–S of Sec. 15; and in Township 3S, R9E, Sec. 30, the south half of Field #31–N, and all of Field #32–N; plus such other pastures planted to barley and wheat.

"Said acreage to include approximately 475 acres of alfalfa to be pastured from date of contract to February 1, 1962, and approximately 500 acres of barley and wheat with sufficient growth for one pasturing extending into the month of February, 1962 if necessary in order to ensure the sufficient growth for one pasturing. Coury Bros. also to agree to furnish one irrigation during this period.

"Kenneth L. Ellsworth and Coury Bros. agree mutually to cooperate in this pasturing program to allow the plowing of alfalfa commencing February 1st through the month of February, 1962.

"Said Kenneth L. Ellsworth agrees to pay a total of $15,000.00 for the pasturing of his sheep on the above pastures, with $5,000.00 paid on the date of this contract, with a payment of $5,000.00 on December 1, 1961, and a final payment of $5,000.00 on February 1, 1962, to Coury Bros. Ranches, Inc., at Mesa.

"This contract agreement is subject to all the usual conditions governing similar agreements in case of default, failure to abide by any part of such agreements by either party to the agreement, legal costs in case of such default, etc.

s/ Kenneth L. Ellsworth

Kenneth L. Ellsworth

s/ Albert M. Coury

Albert M. Coury, Pres.
COURY BROS. RANCHES, INC."

Coury advances seven questions on appeal which in general may be said to embrace the sufficiency of Ellsworth's evidence to support any judgment for damages under the present posture of the case. Two legal propositions are common

to these questions: whether Ellsworth can recover for the avoidable consequences of known breaches, and whether the evidence was sufficient to establish the Ellsworth's damages with reasonable certainty.

The obligation to avoid the consequences of known injuries was recognized by this court in S. A. Gerrard Co. v. Fricker, 42 Ariz. 503, 27 P.2d 678, 680, a case of destruction of bees and bee colonies. There we said:

> " 'Stated in broad terms, however, the measure of damages is such sum as will compensate the person injured for the loss sustained, with the least burden to the wrongdoer consistent with the idea of fair compensation, and with the duty upon the person injured to exercise reasonable care to mitigate the injury, according to the opportunities that may fairly be or appear to be within his reach. * * *' 17 C.J. 844, § 166."

Avoidable consequences is in part discussed by Corbin in this vein:

> "It is not infrequently said that it is the 'duty' of the injured party to mitigate his damages so far as that can be done by reasonable effort on his part. Since there is no judicial penalty, however, for his failure to make this effort, it is not desirable to say that he is under a 'duty'. His recovery against the defendant will be exactly the same whether he makes the effort and mitigates his loss, or not; but if he fails to make the reasonable effort, with the result that his injury is greater than it would otherwise have been, he cannot recover judgment for the amount of this avoidable and unnecessary increase. The law does not penalize his inaction; it merely does nothing to compensate him for the loss that he helped to cause by not avoiding it." 5 Corbin on Contracts, § 1039 pp. 242 & 243.

Justice Cardozo in discussing the damages in a concurring opinion to which a servant was entitled who was wrongfully discharged said:

> "What is meant by the supposed duty is merely this: That if he unreasonably reject [other employment] he will not be heard to say that the loss of wages from then on shall be deemed the jural consequence of the earlier discharge. He has broken the chain of causation, and loss resulting to him thereafter is suffered through his own act." McClelland v. Climax Hosiery Mills, 252 N.Y. 347, 169 N.E. 605, 609.

The pastures specified in the contract between the litigants before this court consisted principally of 80 acre tracts scattered over an area of some 5 or 6 miles. Ellsworth had been in the sheep business for eighteen to twenty years and had pastured sheep with Coury for a number of years prior to October 16, 1961. However, the pasturage had always been on a per head per day basis. His theory of damages was that, because Coury did not properly irrigate the alfalfa or timely plant and irrigate the winter barley and wheat, there was insufficient feed resulting in the death of his sheep by bloat, starvation and disease. Coury concedes that there was evidence submitted to the jury from which it could have found breaches of the agreement but attacks both the legal basis for the submission of the evidence and its sufficiency to sustain any judgment.

Concerning the barley and wheat Ellsworth testified that prior to the signing of the contract:

> " * * * I told Mr. Coury that if I was to pasture barley it would have to be planted immediately. Barley should be planted before the 1st of November to get a pasturing. The ideal time would be the 1st of October.
>
> * * * * * *
>
> " * * * it has to have sufficient growing period to get up to the height for pasturing, if it's to be pastured off—well, the contract read into February and had to have that growing period to get that pastured off before the time limit.
>
> * * * * * *

"He agreed that it could be done."

At another time he testified: " * * * it has to be planted in October, not any later than the 1st of November."

The earliest planting of barley or wheat was on the 20th or 25th of November, 1961, and the other plantings were made through the 14th of January, 1962. In a conversation with Coury's ranch manager on the 12th of November, Ellsworth expressed concern "that barley and wheat hadn't been planted and it was—well, it was just getting too late. *I knew it was too late then.*" (Emphasis supplied).

█ Accordingly, it is clear from Ellsworth's own testimony that he was aware at least as early as the middle of November, 1961, that 500 acres of barley and wheat would not be available for pasturing in February of 1962. At that time it became his duty to make reasonable efforts to prevent losses which could occur from insufficient pasturage.

In considering the evidence concerning the alfalfa the testimony of Kenneth L. Ellsworth is so uncertain, inconsistent and contradictory, that it is impossible to determine what basis the jury used in determining the issues as submitted to them by the trial court. Ellsworth testified concerning the alfalfa that " * * * it was a fair stand all the way through;" that he moved the first sheep onto the property on the 21st of October and by the 31st of October had a peak number of 3,170; that by the 2nd of December the sheep had grazed off the alfalfa and were taken from the Coury property to other pasturage.

His testimony was:

"Q. And how long did that number of sheep remain on the Coury Ranch?

"A. It [sic] went on it the 21st of October, and then the 23rd of October there was two different moves on there, and the last little bunch was moved off of the last piece of alfalfa that would have been either fourteen or fifteen N. the second of December. * * *"

Later he testified:

"Q. How many sheep were on the Coury Ranch at the end of November?

"A. That would be—

"Q. Again an approximation if you can arrive at it from your figures.

"A. Oh, approximately fifteen hundred the end of November."

It was Ellsworth's plan to bring the sheep back onto the alfalfa again.

" * * * I figured it would take six weeks to two months for that feed to grow back to a sufficient growth for another good pasturing if this irrigation program would have been followed like we talked about and agreed to."

Although he knew it would take six weeks to two months to grow back for another "good pasturing," and the sheep "weren't in good shape" he brought them back onto the Coury land about the 1st of December.

"Q. Mr. Ellsworth, what was the condition of your sheep at approximately the 1st of December, 1961?

"A. Let's see. The 1st of December they were—they weren't in good shape. That is when I had gone back on to Coury Brothers on this short alfalfa and they weren't—well, they weren't receiving the foods that they should have."

He first stated that he started moving them off again about the middle of December because of the condition of feed:

"Q. What date was the bulk of your main move from Coury land?

"A. I started moving off the middle part of December, and, well, from about around the 15th to the 20th of December, on up to the first part of January I was moving sheep out. * * *"

But later he testified it was the first part of January.

"Q. Mr. Ellsworth, I believe you testified yesterday that early in December you came back on to the Coury Ranch for the second time for your second pasturing, is that correct?

**520**

* * * * * *

"A. * * * Yes, sir, that's correct.

"Q. And I believe it was your testimony, was it not, that you had approximately 3,051 sheep on the Coury Ranch at that time, is that correct?

"A. That was through the month of December, yes, sir.

"Q. Now when did you first begin moving these sheep off the ranch?

"A. Let's see. That was my second time over. The first part of January I started moving off again."

It is impossible to reconcile the manifest contradictions in Ellsworth's testimony, but one fact stands out clearly—assuming that if some fields were pastured off by the first of November, the earliest he could have gone back would have been the middle of December, and other fields at a corresponding later date, even as late as the 15th of January for those fields pastured off at the end of November. If all fields had been immediately irrigated under Ellsworth's interpretation of the contract, the move back onto the Coury fields early in December was still too soon to provide adequate or proper pasturage.

But irrespective, the point to be made is that Ellsworth was aware of the critical condition of the alfalfa at this time. In the conversation with Coury's manager on the 12th of November previously referred to, he testified:

"Well, I told him that I was very much concerned at that time. I had already pastured part of that ground off, the alfalfa ground, and wasn't receiving any irrigation. * * *."

Ellsworth attributed his loss of sheep, ewes and lambs, principally to bloat while they were at the Coury fields in December although some deaths were caused by starvation and disease. He testified, "any grain, green alfalfa will cause bloat." "* * * that's the feed you should stay completely away from." Yet despite the fact that there was little feed and the alfalfa was green he did not secure other pasturage until after the second move.

"Q. Now you went out and secured additional pasturage at the end of this move, [the second move back onto the Coury lands] is that so?

"A. Yes. * * *"

The record is therefore clear that Ellsworth brought his sheep back to the Coury ranch, knowing that the feed was insufficient and improper. It does not reflect that he made any effort to obtain additional feed, either through other pasturing or supplemental feed such as hay, until death from bloat, starvation and disease either was imminent or had occurred. Under these circumstances in the language of Justice Cardozo in McClelland v. Climax Hosiery Mills, supra, the chain of causation was broken and the loss resulting thereafter was "suffered through his own act."

The rule on avoidance of consequential damages is often stated in language similar to that used in the Restatement of the Law of Contracts, § 336, subsection (1):

"(1) Damages are not recoverable for harm that the plaintiff should have foreseen and could have avoided by reasonable effort without undue risk, expense, or humiliation."

And see: Commodity Credit Corp. v. Rosenberg Bros. & Co., Inc., 243 F.2d 504, 9 Cir., cert. den. 355 U.S. 837, 78 S.Ct. 62, 2 L.Ed.2d 48; Warren v. Stoddart, 105 U.S. 224, 15 Otto 224–230, 26 L.Ed. 1117; Industrial Sugars, Inc. v. Standard Accident Ins. Co., 338 F.2d 673, 7th Cir. Illinois; Hannon Motor Lines, Inc. v. Liberty Mutual Ins. Co., 214 F.Supp. 250 (D.C.Pa.); Gibson v. Lee Wilson & Co., 211 Ark. 300, 200 S.W.2d 497; Hall v. Paine, 224 Mass. 62, 112 N.E. 153, L.R.A.1917C, 737; Cooper v. Stronge & Warner Co., 111 Minn. 177, 126 N.W. 541, 27 L.R.A.,N.S., 1011; Miller et al. v. Western Union Telegraph Co., 157 Mo.App. 580, 138 S.W. 887; Stonega Coke & Coal Co. v. Addington,

112 Va. 807, 73 S.E. 257, 37 L.R.A.,N.S., 969; Harris Structural Steel Co. v. Chapman, 162 Misc. 709, 295 N.Y.S. 443.

This court in Cole v. Atkins, 69 Ariz. 81, 86, 209 P.2d 859, 862, quoted to this effect from the case of Hickman v. Johnson, 36 Cal.App. 342, 178 P. 145, 147, a suit for damages for a breach of contract to sell land where the vendor also sold rights in water when in fact he had none:

> " '* * * it is apparent that this element of damage can not be considered for the reason that, according to the allegations of the cross-complaint, the defendant, before planting said crop, had complete knowledge that plaintiff did not own the said Dallas ditch and could not therefore convey any interest in it to the defendant, * * * Therefore, if defendant, with knowledge of these facts and the failure of plaintiff to complete its agreement, planted a crop, incurring the cost thereof, and took a chance of having a crop without irrigation, it must be apparent that any loss thereby incurred must be chargeable to his own want of care, no matter how remiss might have been plaintiff in its conduct toward the defendant. * * *' "

Similarly, when Ellsworth brought the sheep back to the Coury lands knowing that there was not sufficient pasturage and that the pasturage was green and would cause bloat, he took a chance "that any loss thereby incurred must be chargeable to his own want of care."

■ It is the Coury's further position that the evidence was insufficient to establish the Ellsworth's damages with reasonable certainty. We are compelled to agree. Some principles are accepted everywhere. Proof of the fact of damages must be of a higher order than proof of the amount of damages. Gilmore v. Cohen, 95 Ariz. 34, 386 P.2d 81, 11 A.L.R.3d 714; Grummel v. Hollenstein, 90 Ariz. 356, 367 P.2d 960; Jacob v. Miner, 67 Ariz. 109, 191 P.2d 734; Martin v. LaFon, 55 Ariz. 196, 100 P.2d 182. Damages that are speculative, remote or uncertain may not form the basis of a judgment. The speculations, guesses or estimates of witnesses form no better basis of recovery than the speculations of the jury themselves. White River Sheep Co. et al. v. Barkley et al., 37 Ariz. 49, 288 P. 1029.

■ That there was a custom and usage as to the time for planting wheat or barley for feed by sheep in February finds no support whatsoever in the record. Nor is there evidence upon which to submit to the jury custom and usage in a flat fee contract—that alfalfa lands would immediately be followed by an irrigation after the sheep were taken off the pasturage. In Coyner Crop Dusters v. Marsh, 90 Ariz. 157, 175, 367 P.2d 208, 220, we clearly pointed out the basis for submitting to the jury evidence of custom and usage:

> "Custom must be established over a considerable period of time, by numerous repetitious instances in order that there be no doubt with reference to its nature and character. [Citation] Custom must be certain, uniform and not a loose or variable practice or left to the discretion of the individual."

Testimony establishing a practice of what one farmer did on a per head per day rental is not evidence of a custom for flat fee rental contracts and can not be used to impress additional burdens thereon.

■ It should be added that the testimony assertedly concerning custom and usage and other testimony implying agreed times for irrigations and for the planting of winter grains are flagrant violations of the parol evidence rule. Custom or usage is only justified when there is an ambiguity or uncertainty in the written instrument. See 55 Am.Jur. Usages and Customs § 29, p. 289. The obligation imposed by the contract was "to furnish one irrigation during this period." This language is not ambiguous. The time for irrigating was any time during the life of the contract. Since it was specifically made indefinite, it can only be construed as meaning that the time of irrigation "during this period"

was left to the Coury's sole discretion. Only if Coury did not provide such an irrigation would he be chargeable with a breach of contract—irrespective of Ellsworth's plan to pasture the land.

■ Similarly, as a matter of law since the contract imposed no specific obligation on Coury as to time for planting barley and wheat, it must be construed as leaving the times of planting to Coury's determination. Coury's obligation was not to plant at a certain time but was to have wheat and barley pasturage available "extending into February, 1962, if necessary." If it was not then available, there was a breach. It was neither the duty nor the right of the superior court to rewrite the contract with terms more favorable to either party than those provided by the instrument. Goodman v. Newzona Inv. Co., 101 Ariz. 470, 421 P.2d 318.

■ Further, Ellsworth's personal estimate of the number of animals lost and the cause of their deaths is too speculative and conjectural to be the basis of a judgment. Concerning his death losses he testified that his average death loss was 3% "normally it's around three percent." Concerning the ewes he testified: "Well, my normal death loss should have been 100 head for that period of time; and I lost 350 ewes. 250 would be the excess over 100 head." His calculations were derived by taking the difference from a count after returning from the mountains in the fall of 1961 and a count taken in the spring of 1962 at the time the sheep were sheared.

Concerning the lambs he testified that 100 ewes will normally bear 125 or 130 lambs; that he only sold 3,129 lambs that spring; that he should have had a larger number which he estimated would be 752 lambs more, a death loss of about 19%. He made no attempt to take a count of the number of lambs and ewes that died. "They were hauled off * * * some were buried."

Ellsworth could not give any testimony as to how many sheep died respectively from bloat, starvation or disease. He attributed all of his losses to Coury testifying:

"Q. Mr. Ellsworth, how many sheep did you lose to bloat?

"A. I couldn't give you an exact count on that. I didn't count the number of animals that bloated and the number that died from starvation. I didn't keep figures on that.

"Q. How many animals died as a result of a disease?

"A. Well, that I would have to answer that the same way. I just don't know. * * *"

In addition to making no effort to ascertain by counting the number of animals that died or the causes of death, neither did he endeavor to ascertain their ages and value. Old ewes were worth seven to ten dollars ($10.00) and good breeding ewes were worth twenty-two dollars ($22.00). But the jury was left to speculate whether it was the old ewes or the good breeding ewes that died or to guess at the possible combinations of old and good ewes that died. (The verdict returned after correction by the court, computes to $22.00 for each ewe claimed to have been lost.)

In all of its aspects it is plain that the testimony concerning the Ellsworth's damages was so highly speculative and conjectural that it wholly fails to support a judgment with the reasonable certainty required by law.

■ We note Coury's argument that the measure of damages is governed by our statement in Jacob v. Miner, supra, 67 Ariz. 109, 191 P.2d 734:

"The general rule as to damages for the breach of contract is:

" 'As a general rule, sometimes expressed in statutory enactments, the damages to which one party to a contract is entitled because of a breach thereof by the other are such as arise naturally from the breach itself, or such as may reasonably be supposed to have been within the contemplation of the parties

at the time of making the contract as a probable result of a breach thereof. * * *'" 67 Ariz. at 115, 191 P.2d at 738

The proper measure of damages for the failure of Coury to provide the pasturage specified in the contract would be the cost of other suitable pasturage or feed; and the special damages alleged as arising from the breach, that is, the death and destruction of Ellsworth's sheep, must be proved as unavoidable under the special circumstances of the case since they do not "arise naturally from the breach itself." This was the Ellsworth's burden under the allegations and theory of the counterclaim.

Ellsworth's unsubstantiated testimony that he had no alternative but to bring his sheep back onto the Coury ranch on December 1st, finds no support in the other facts and circumstances or testimony in the case in that it is clear he made no timely effort to find other pasturage or to provide supplemental feed knowing that it would take 6 weeks to two months for the alfalfa to grow back and that the barley and wheat would not be ready for a February pasturage. The trial court should have restricted the evidence of damages to the cost of acquiring additional pasturage or supplemental feed.

■ It is the Ellsworth's position on cross-appeal that the court erred in refusing to award them attorneys fees under the last clause of the contract allowing "legal costs in case of such default, * * *." The words "legal costs" mean such costs as are usually recovered in civil actions and and does not include attorneys fees. Mercer v. Coleman, 227 Ky. 797, 14 S.W.2d 144; Childs v. New Haven & Northampton Co., 135 Mass. 570; Crocker v. Baker, 35 Mass. 407, 18 Pick. 407.

As a further issue on their cross-appeal the Ellsworths complain of the trial court's granting a new trial on the issue of the damages awarded for the lamb losses. Since for the reasons heretofore set forth this cause must be reversed for a new trial in its entirety, the consideration of this issue is unnecessary.

Judgment reversed and remanded for new trial.

UDALL, V. C. J., and BERNSTEIN, J., concur.