Noel Cockrum v. Charles Pattillo

5-4682                                          439 S.W. 2d 632

Opinion Delivered April 7, 1969
[Rehearing denied May 12, 1969.]

*Spitzberg, Mitchell & Hays* for appellant.

*Virgil Moncrief* and *John Harris Jones* for appellee.

Conley Byrd, Justice.    This action was commenced in the trial court by appellant Noel Cockrum to recover the balance due on a contract for the sale of used cars, furniture, fixtures, office equipment, parts, and signs, comprising Cockrum Motor Company, together with $235 rent per month accruing on a building.    Appellee Charles Pattillo answered admitting the contract.    He counterclaimed alleging that Cockrum fraudulently misrepresented the past income of the business and the value of the used cars, equipment, etc., resulting in overpay-

ment and losses for which Pattillo was entitled to recover from Cockrum. The trial court found for Pattillo and awarded him judgment against Cockrum for $20,-603.24. For reversal Cockrum relies upon the following four points:

1. The court erred in finding that the transaction was tainted with fraud and in failing to award the appellant a judgment on the contract.

2. The court erred in failing to hold that the appellee had waived the alleged fraud and ratified the contract.

3. The court erred in cancelling the rental portion of the contract between appellant and appellee by reason of fraud.

4. The court erred in awarding damages to the appellee upon the evidence introduced by the appellee.

The facts shown in the record and the issues raised here are set forth in an opinion filed by the trial court. The trial court's opinion is as follows:

"The pleadings consist of a complaint by Noel Cockrum, hereafter referred to as plaintiff, with an attached contract and supplemental sales contract signed by plaintiff and defendant, Charles Pattillo, hereafter referred to as defendant, an amendment to the contract signed by plaintiff and defendant, the date of which is not shown, a receipt dated May 6th for $2,661.50 paid by defendant to plaintiff and a receipt dated May 18, 1964 for $2,317.93 paid by defendant; and answer and cross-complaint was filed by defendant in due time. A motion to strike answer and cross-complaint was filed by the plaintiff to which defendant filed a response. Plaintiff filed his answer to cross-complaint in which plaintiff admitted he agreed to charge defendant one half of the cost of office fixtures and equipment, denied the

other allegations, pleaded that there was an account stated between the parties and that the defendant was barred by laches from alleging fraud. The defendant filed an amendment to the answer and cross-complaint and likewise amendment was filed to the complaint reducing the amount due under the contract from $12,713.64 to $10,000. That a motion to require production of records was necessary to be heard and plaintiff required to submit to the defendant the said record. A second amendment to answer and cross-complaint was filed by the defendant. Likewise amendment to the motion to require production of certain documents was filed by defendant. The plaintiff propounded 27 interrogatories to defendant which were duly answered. John Harris Jones, one of the attorneys for the defendant filed an affidavit for the production of certain records prior to trial which had been ordered by the court at a pretrial hearing.

"The contract in question was drawn personally by the defendant. Exhibits upon which the contract was based, i.e., inventory of furniture and fixtures, shop equipment and automobiles were prepared by the plaintiff or at his direction. Contract as signed called for the payment of $30,000 at the time of the execution but was amended apparently on the same day by the parties and $20,000 was paid by defendant to plaintiff and an agreement to pay the balance as set forth in the amendment to the contract. Defendant was obligated to pay for second-hand cars and to rent from the plaintiff the building and grounds for the sum of $235 monthly for a period of five years with certain options in the contract. Defendant paid $2,661.50 on May 6, 1964 and May 18, 1964, $2,317.93.

## "PARTIES

"The parties later agreed that the inventory of used cars supplied by the plaintiff to the defendant were overpriced and jointly agreed to a reduction of $4,928.78. The parties were negotiating for a settlement of other

features of the contract which the defendant claimed was improper when negotiations were broken off and this action was filed. Plaintiff Noel Cockrum sued for the amount due under the contract as amended and for the rent on the building that had accrued.

"Defendant in his answer and cross-complaint alleged fraud in the execution of the contract and concealment of the facts and prayed for a judgment in damages of $78,577.57, for the cancellation of the lease agreement. The claimed damages consisted of the following items, to-wit: The repayment of $8,877.57 alleged overpayment and for damages $39,800 actual loss and $30,000 loss of profits.

"The proof was intricate and voluminous. By stipulation in open court at the conclusion of the testimony a transcript of the evidence was to be made by the court reporter and a copy furnished to each side and the expense thereof to be charged equally, provided in the event of an appeal by either side the amount so paid the reporter would be credited upon the appellant's cost.

"Excellent briefs have been filed by both sides.

"There is no dispute about the execution of the sale contract or the adjustment that was agreed upon by the parties and the amount due thereunder if there be no fraud.

"Defendant claims that he was fraudulently induced to sign the contract through misrepresentation of some facts and concealment of other facts.

"Plaintiff denies fraud. 342 pages were required to record the testimony taken at the trial. During the trial when it developed that the many secondhand cars which were sold, resold, repossessed, 'traded down' etc., produced a volume of detail that was more than should be heard by a court with a full docket without benefit of a master, the court offered, if agreeable to both counsel

to appoint a master and let him pursue all of the involved and intricate matters and make a record of his investigations, submit the same to the court along with his recommendation. This offer was refused and the court did the best possible under the circumstances to get at the facts involved in this intricate transaction in the time available.

"It appears that plaintiff was a second hand car dealer for a few years and then secured the franchise for the sale of Ramblers and other cars made by the American Motor Company. The Rambler operation was not successful for the first couple of years. Then for two years the income returns of the corporation showed a substantial profit.

"The plaintiff owns extensive farming interests from which at times he received excellent returns. The income tax records of the farm as well as the motor company are in this record. They show that the first years when the Cockrum Motor Company, hereafter referred to as the motor company, lost money, the farm income was quite substantial and in the two years that the motor company paid tax upon its profits the farm income was markedly reduced. The tax return for the final year of the motor company which was filed after the sale was consummated showed a loss of $26,519.50. The plaintiff's counsel explained in the brief that this loss was a result of inflation of the value of the assets at the time the corporation was formed and could not be considered in determining whether or not the corporation was operating profitably.

"The plaintiff decided to dispose of the motor business and negotiated with several people, one of whom testified—Mr. Ray Crosby of Stuttgart.

"Defendant testified that the plaintiff told him the business was making from $10,000 to $15,000 per year. The plaintiff admitted on the stand that he had told de-

fendant that the business would make a thousand dollars per month.

"The defendant testified that the plaintiff knew the defendant was ignorant of the automobile business and told the defendant that the plaintiff had a sufficiently well trained organization to permit the business to operate itself with but little supervision. Plaintiff testified that he never told anyone that an unsupervised business would run itself.

"This and other testimony about negotiations and so forth prior to the signing of the contract by both parties was admitted under the rule laid down in *Arkansas Amusement Corporation* v. *Kempner,* 182 Ark. 897, 33 S.W. 2d 42, (1930), where it was held,

" 'It is the settled rule in this state that parol evidence of conversations and negotiations leading up to the execution of a contract, as well as the relation of the parties thereto and the attendant circumstances to explain and aid in the interpretation of uncertainties and ambiguities contained in writing, may be admitted.'

"This rule was discussed and approved in the recent case of *Jefferson Square* v. *Hart Shoes, Inc.,* 239 Ark. 129, 388 S.W. 2d 902 (1965), where it was said,

" 'In reaching the result * * * that where there is any doubt or ambiguity about the meaning of a contract it will be resolved against the party who prepared it—and it is conceded that appellant prepared the lease contract here under consideration. However the rule just mentioned is not to be applied until and unless a "doubt" exists after the court has given consideration to the parol evidence referred to in the Kempner case, supra.'

## "CAN DEFENDANT RECOVER DAMAGES?

"Where fraud or deceit exists in a transaction the one who is deceived must act promptly to have the contract set aside or he will have waived his right. The defendant did not act promptly in this transaction after he discovered the fraud so the original contract cannot at this time be revoked.

"Does that mean that the defendant is not entitled to damages suffered by the fraud? The answer is found in *McCormick* v. *Daggett,* 162 Ark. 16, 257 S.W. 358 (1924), quoting from headnote,

" 'It does not follow that because purchaser of land locses his right of rescission for fraud by failure to diligently disaffirm, that he has no right or recoupment for damages for deceit.'

"The late case of *Kotz* v. *Rush,* 218 Ark. 692, 238 S.W. 2d 634 (1951), contains similar facts.

"In that case the buyer bought a business on the White River in Carroll County located on U. S. Highway 62 which had cabins and a store and various paraphernalia used in operating a fishing camp. The seller represented that the business was making $6500 per year. The plaintiff attempted to foreclose his mortgage and the buyer, defendant, cross-complained for damages for deceit and fraud. The defendant had not sought a rescission of the contract.

"The Chancellor found for the defendant in the sum of $8,000 and directed it be credited on the mortgage. In affirming the trial court the opinion states:

" 'The authorities generally seem to recognize the rule that false representations by the seller as to present or past income of the property sold or conveyed will, if relied upon by the purchaser, constitute actionable fraud. The following statement

is found in 23 Am. Jur., Fraud and Deceit, § 68: "A false representation by an owner of land, or his agent, seeking to dispose of the property commercially, as to the present or past income, profits, or produce thereof or as to the amount of rent received therefor is regarded as a statement of fact upon which fraud may be predicated if it is false, since these are matters within the representor's own knowledge. The same is true of an assertion that the profits of a business are or have been a certain sum annually, or a false statement as to what a business now earns." See also, Williston on Contracts, § 1492; 55 Am. Jur., Vendor and Purchaser, § 84; *Hecht* v. *Metzler,* 14 Utah 408, 48 P. 37; *Whitney* v. *Bissell,* 75 Ark. 28, 146 P. 141, L.R.A. 1915D, 257; *Cross* v. *Bouch,* 175 Cal. 253, 165 P. 702; *Hogan* v. *McCombs Bros.,* 190 Iowa 650, 180 N.W. 770; *Vouros* v. *Pierce,* 226 Mass. 175, 115 N.E. 297.'

"The opinion further states:

" 'The remedies of a purchaser in cases of this kind are set forth in *Danielson et al* v. *Skidmore, et al,* 125 Ark. 572, 189 S.W. 57, 58 as follows: "He may rescind the contract, and by returning or offering to return the property purchased within a reasonable time entitle himself to recover whatever he had paid upon the contract. Again, he may elect to retain the property and sue for the damages he has sustained by reason of the false and fraudulent representations, and in this event the measure of his damages would be the difference between the real value of the property in its true condition and the price at which he purchased it. Lastly, to avoid circuity of action and a multiplicity of suits, he may plead such damages in an action for the purchase money, and is entitled to have the same recouped from the price he agree to pay. *Matlock* v. *Reppy,* 47 Ark. 148, 14 SS 546; *Fort*

*Smith Lumber Co.* v. *Baker,* 123 Ark. 275, 185 S.W. 277.'

" 'Appellee chose the last remedy mentioned above and the only issue is whether the chancellor's findings are against the preponderance of the evidence."

"DID PLAINTIFF COCKRUM FRAUDULENTLY INDUCE DEFENDANT PATTILLO TO SIGN THE CONTRACT?

"Each of the parties were sui generis. Each of them is an intelligent and successful business man in his own field. The defendant operated two insurance agencies, one in DeWitt and one in Stuttgart successfully. The plaintiff was a second hand car dealer before he secured the automobile agency. And in addition he had a good sized farm. Neither had any legal assistance so far as the record shows. These parties had been friends for more than ten years prior to the execution of the contract sued upon. Defendant handled most of the insurance business of the plaintiff, he claims 80% and plaintiff did not deny it. They drank coffee together often, went to football games together and visited in their respective homes at various times. DeWitt is a small city where most of the knowledgeable people know most of the details about the people with whom they associate. Plaintiff should have known that defendant was uninformed about the automobile business, that defendant was in the business of writing hazard insurance. After operating the used car business for several years plaintiff secured the Rambler franchise. He organized Cockrum Motors, Inc. with assets capitalized at $50,000.

"The Rambler operation was not successful for its first two years. The explanation for this, offered by the plaintiff is that all automobile companies have good and bad years. His farming operation was profitable. The two years immediately before the sale of the busi-

ness to the defendant, Cockrum Motors Inc., hereafter referred to as the motor company, paid substantial income taxes. The returns showed it was making a substantial profit.

"It is a coincidence that when the motor company made the profit, farm income fell off remarkably. The plaintiff was in an advantageous position of being able if he wished, to transfer funds from farm to company and back. He admitted he had followed this practice in his testimony. The results of this practice would be that if he chose to pay the income tax due, through the motor company it would mean but little change in his overall tax liability for the farm income would be reduced.

"If a man wished to dispose of a business, it would be advisable for him to show that it was earning a profit. The most convincing way would be to pay income taxes to the government.

"It is in the record that the plaintiff wished to sell the business; he approached several persons, one of whom, Mr. Ray Crosby of Stuttgart, testified that plaintiff tried to sell it to him.

"The defendant testified that the plaintiff told him that the business was making from $10,000 to $15,000 per year; that the organization he had needed little supervision to run the business. Plaintiff admitted telling the defendant that the business would need but little supervision. If there was no other testimony on this point then the court must find for the plaintiff because fraud is never presumed and of course the one alleging it has the burden of proving it to the court's satisfaction. In the case of *Rose* v. *Moore,* 196 Ark. 527, 118 S.W. 2d 870 (1938), the court said,

"Fraud is never presumed, and the burden is upon the party alleging fraud, to prove it by pre-

ponderance of evidence.' See also, the following cases to the same effect, to-wit: *Green* v. *Bush,* 203 Ark. 883, 159 S.W. 2d 458; *Biddle* v. *Biddle,* 206 Ark. 623, 177 S.W. 2d 32; *Ellis* v. *Ellis,* 220 Ark. 639, 249 S.W. 2d 302, and many other cases.

"To support his allegations the defendant called Mr. Ray Crosby of Stuttgart, a heavy machinery contractor, who testified that the plaintiff had tried to sell the business to him; that plaintiff had stated the business was making from $10,000 to $15,000 annually; that the manager or bookkeeper and crew that plaintiff had were capable of operating the business. Crosby was interested in acquiring a business because he had two boys for whom he wished to provide a business and he thought this would be ideal for that. He even discussed with plaintiff, the idea of fixing a place for him to rest because Crosby wanted him to look after the business if he bought it, while his boys would be learning how to operate it.

"This to some degree substantiated the defendant's testimony on this line. The strange see-saw effect between the farm income and the income of the motor company is another circumstance, when one was down the other was up and vice versa. Plaintiff was asked on cross-examination to explain this. He did not refer to poor crop years, to storm damage, to insect loss, to adverse weather condition, such as being too dry or too wet, or raining at the wrong time which ordinarily farmers use to explain their failure to make good crops. The only explanation that plaintiff gave was lack of management of the farm.

"That plaintiff knew something was wrong is shown by the fact that when challenged by defendant about the list of cars given to him as the basis of the contract price and that it was not the list of cars that plaintiff and his manager had used and priced out plaintiff agreed to a reduction of almost $5,000 and was very careful to include in the statement signed by both of them that this

was to rectify 'an honest mistake made in computing the value of the used cars sold * * *'. It is most praiseworthy to correct mistakes, honest or otherwise, but it is evident that the plaintiff was anxious to have the record show that it was 'an honest mistake.' It is seldom necessary for an honest man to proclaim his honesty.

## "THE DEFENDANT

"It was the plaintiff's manager who had been retained by the defendant who called defendant's attention to the fact that the list of cars had been overpriced and was not the list that manager and plaintiff had gotten up according to defendant's testimony. There were other items which defendant claimed were overpriced according to the agreement that he had with plaintiff and about which the plaintiff had said that he would do 'the right thing.' One of these overpriced items was the following example. Proof showed that the building and equipment were acquired by plaintiff for $8,000. Two hydraulic hoists and a wheel aligning machine which were acquired by plaintiff with purchase of the building were attached to the building and were retained by plaintiff. Plaintiff set original cost of building in his depreciation schedule in the U. S. Income Tax Return at $6,359.46 with addition of $2,900.00 at total of $9,159.46.

"The machine shop equipment original cost was shown as being $3,823.77.

"On lists from which contract was drawn the cost of the equipment is shown so much higher that the agreed 50% was much greater than the original reported to the Internal Revenue Service. Negotiations for an adjustment of these items were carried on for some time but broken off before they were concluded.

"It is probable that no one circumstance by itself would be sufficient to sustain the allegation of fraud. But all of these circumstances taken together with the admitted fact that plaintiff wanted to sell and was try-

ing to sell the business to others and to at least one other person had made some or similar allegation about the amount the business was earning and the operating crew's ability to run the business without much supervision, coupled with the fact that the parties had been friends for more than ten years prior to the sale and the further fact that plaintiff knew that the defendant had no knowledge of the automobile business and the further fact that the plaintiff had lost money in the business for two consecutive years and only did show a profit in the business when his farm income went down materially leads the court to believe that plaintiff deliberately over-reached in his dealing with his friend, the defendant.

" 'While fraud need not be shown by direct or positive evidence but may be proven by circumstances, it must reasonably follow from the circumstances proved.' *Biddle* v. *Biddle, supra.*

" 'Fraud may be proved by circumstantial evidence, if it affords clear inference of fraud and more than a mere suspicion or conjecture.' *Renn* v. *Renn,* 207 Ark. 147, 179 S.W. 2d 657.

"The court finds that the contract and amendment attached to it are tainted with fraud.

"The contract was executed in December of 1963 and two payments totaling the sum of $4,979.43 were made by defendant on or before May 18, 1964. If those payments were made by defendant after he knew or should have known that his contract was fraudulent his action in making the payment would have validated the contract.

"On the stand defendant said when asked about the fact that he had signed a statement rectifying the 'honest mistake' about the valuation of cars and the payments of these two amounts, 'I still thought that Cockrum was honest and would do the right thing.' It was the manager, defendant claimed who called his attention

to the overpricing of the cars. It was not discovered by defendant. (It seems that the defendant was still ignorant about the automobile business.) No evidence was offered to contradict this by the plaintiff, that the defendant still considered plaintiff honest with him. The court finds that the payment by defendant of the two payments in May of '64 and the signing of the writing reducing the amount due on the used cars did not waive or ratify the fraudulent character of the original contract.

"The defendant in his cross complaint asked for $8,777.57 for alleged overpayment and $39,900 for actual damages or a total of $48,577.57. In addition the defendant asked for $30,000 for loss of profit.

"The court disallows claim for any loss of profit and finds that the defendant has suffered damages in the sum of $25,000. Said sum shall bear interest at the rate of 6% per annum from this date until paid.

## "RENT

"The contract provided the defendant should rent the building and premises from the plaintiff for $235 per month for a minimum of five years with certain options of renewal and purchase granted to the defendant. There is no evidence that the defendant has surrendered the premises to the plaintiff. Defendant claims to have stopped paying rent in August of '66 and plaintiff says defendant stopped paying rent in June of the same year. No evidence is offered that the rent is too high or out of line with rent being charged for like buildings and premises similarly located. The court finds the defendant to be liable for the monthly rental at said rate from July 3, 1966 until this date on a quantum meruit basis. That a judgment for said rent shall be offset against defendant's judgment.

"The contract being tainted with fraud the obligation for further rentals from the defendant to the plaintiff are hereby cancelled and set aside."

POINT 1. In arguing that the trial court erred in finding the transaction was tainted with fraud, Cockrum says that Pattillo simply bought a business that he was indisposed to oversee, made very little attempt to manage and after losing money attempted three years later to charge Cockrum with the folly of his own mismanagement and then only after Cockrum had sued for the balance due on the contract. We find appellant's assertion to be without merit.

In addition to the testimony recited in the trial court's opinion there are many instances in which Cockrum's testimony, in itself, supports the trial court's finding of fraud. For instance, it was shown that on Oct. 6, 1961, he made a $4,000 deposit from himself to the Motor Company. His explanation was that the $4,000 was for a combine traded for a car valued at $1500, an International truck valued at $1000, a Chevrolet truck valued at $850 and one International truck valued at $650, all of which equipment went to the farm. However, notwithstanding Cockrum's assertion that the equipment went to the farm, he was unable to explain why no depreciation for the equipment was shown on his income tax returns.

At the trial, Cockrum testified that the May adjustment, resulting in the $5,000 deduction from the original contract price, occurred when he and Wayne Fisher adjusted the inventory of used automobiles down to the black book average wholesale price. According to Cockrum the valuation after this adjustment would have been $20,885. However Felix Stephenson, a Ford dealer, applying black book values to the same inventory, arrived at a value of $10,465, less the cost of repairs to the vehicles involved. Thus in addition to the facts related in the trial court's opinion, there is much in the record which adversely reflects on the credibility of Cockrum's testimony. Without elaborating further, we are convinced that the trial court correctly found that Cockrum induced Pattillo to enter into the contract by falsely rep-

resenting that the motor company had been making a profit of $10,000 to $15,000 per year.

POINT 2. It is true that on May 3, 1964, and again on May 18, 1964, Pattillo made two installment payments totalling about $5,000, and at the same time an adjustment of approximately $5,000 was made in the total contract price by Cockrum with Pattillo's consent. It is also true that Pattillo for a number of months made the $235 monthly rental payments due under the contract. Based upon these payments Cockrum argued that Pattillo has waived the fraud.

We cannot agree with Cockrum's contention. The authorities make clear that before such payments will constitute a waiver it is essential that the victim have full knowledge of the fraud practiced upon him, that he intend to affirm the contract, and abandon his right to recover damages for the loss resulting from the fraud, *Southark* v. *Pesses,* 221 Ark. 612, 254 S.W. 2d 954 (1953). Pattillo's testimony was that he knew nothing about Cockrum's fraud when he made the May 3rd and May 18th, 1964, payments. In fact he said he did not know what was really happening until two years later. Further, Mrs. Wilson testified that she worked for Pattillo Motor Co. from Sept. 1964 through Feb. 1967 and was present during the discussions between Mr. Pattillo and Mr. Cockrum about adjustments. Therefore under the circumstances the record does not support Cockrum's contention that Pattillo made the payments with full knowledge of the misrepresentations. See *Parker* v. *Johnston,* 244 Ark. 355, 426 S.W. 2d 155 (1968).

POINTS 3 & 4. On the damage issues, Cockrum alleges that Arkansas is committed to the so-called "out of pocket" measure of damages in fraud cases, that there is no testimony as to the true value of the properties Pattillo acquired from Cockrum, and that the trial court erred in cancelling the balance of the rental contract.

We do not agree with Cockrum that this court is committed to the ''out of pocket'' measure of damages in fraud cases. In *Union Motors Inc.* v. *Phillips,* 241 Ark. 857, 410 S.W. 2d 747 (1967), and in *Greiner Motor Co.* v. *Sumpter,* 244 Ark. 736, 427 S.W. 2d 8 (1968), we recognize the so-called ''benefit of the bargain'' rule of damages in fraud cases. In the early case of *Morton* v. *Scull,* 23 Ark. 289 (1861), we specifically held that one damaged because of fraudulent representations about the qualities of a slave was entitled to recover not only the difference between the value of the slave as he was. addicted to running away, and as he would have been, free from that vice, at the time and place where he was bought, but also to the damages caused by the Negro's habit of running away, such as expenses incurred by his capture.

*Thudium* v. *Dickson,* 218 Ark. 1, 235 S.W. 2d 53 (1950), involved a fraudulent misrepresentation relative to the water supply to irrigate a rice crop. We there permitted the tenant to recover the difference between what the land produced and what the land would have produced if water had been available, less the cost of production and marketing,—i.e. the same damages that would have been recovered upon a breach of contract, citing and relying upon *Gibson* v. *Lee Wilson & Co.,* 211 Ark. 300, 200 S.W. 2d 497 (1947).

In *Miles* v. *American Railway Express Co.,* 150 Ark. 114, 233 S.W. 930 (1921), Miles shipped a dog's head packed in ice from Bald Knob to Little Rock for examination to determine whether the dog had rabies. Miles alleged that he told the railroad agent the dog had bitten his daughter and the specific purpose for which the head was being shipped to Little Rock. We held the Express Company was liable for the expenses incurred in giving Miles' daughter the Pasteur treatment for rabies because the company might have reasonably anticipated that Miles would be put to that expense if the package

containing the dog's head should not be promptly delivered to its destination.

In 37 Am. Jur. 2d, *Fraud and Deceit* § 362, p. 490, it is pointed out that in fraud cases, in addition to general damages, a purchaser may be entitled to recover special or consequential damages which are the natural or proximate result of the seller's fraud. We believe that this rule is supported by our cases cited above. The purchaser in the Morton case (above, certainly would not have been made whole by recovering the difference in the value between the slave as he was and as he would have been made whole by recovering the difference in i.e., the expense incurred in the capture of the runaway slave may have exceeded his value as was. For cases from other jurisdictions applying the same rules see *McInnis & Co.* v. *Western Tractor & Equipment Co.*, 67 Wash. 2d 965, 410 P. 2d 908 (1966). When we apply this rule to the facts here under consideration we find that there is ample evidence to sustain the damage award and the cancellation of the lease contract for the balance of the term.

From the testimony of Noel Bates and Felix Stephenson, together with the exibited "black book", it is obvious that the wholesale value of the used cars was not correctly represented to Mr. Pattillo at the time of their transaction or at the time of the adjustment some six months later. Furthermore, from Mr. Cockrum's own records and admissions in his pleadings about the method of fixing the purchase price of shop equipment and office equipment, it is obvious that the price with which Mr. Pattillo was originally charged is not based on the cost price to Mr. Cockrum. When all of these adjustments are taken into consideration a preponderance of the evidence shows that the total value of the items purchased by Mr. Pattillo could not have exceeded $16,-222.43. Since Mr. Pattillo had already paid Mr. Cockrum $25,000 it follows that he had overpaid, because of the false representations, the sum of $8,777.57.

Since the contract between Mr. Pattillo and Mr. Cockrum obviously contemplated that Mr. Pattillo would operate the automobile business in Mr. Cockrum's building for which Cockrum would collect a monthly rental, it obviously follows that Mr. Pattillo would have to supply working capital for day to day operation, including payroll. In this connection, Mr. Pattillo, his accountant and secretary testified that he had plowed in excess of $30,000 into the business for operating capital which he had lost at the time of trial. The only criterion for allowance of such damages is that they not be speculative. Here again we find that Cockrum's own records remove the speculative nature of the losses sustained by Pattillo, particularly within the limits found by the Chancellor. Cockrum's records show that before he began pumping farm income into the motor company, the motor company was losing about $7,500 each year. When we take from the $25,000 damages allowed by the Chancellor the $8,777.57 overpayment, we find that the difference does not exceed the $7500 annual loss sustained by Cockrum when multiplied by the two and half years Patillo was in business. On this basis we find that the damage allowance was proper, as the natural and proximate result of Mr. Cockrum's fraud.

What we have heretofore said about operating losses holds true with respect to the balance of the rental contract. The rental contract was tied to the purchase and operation of the automobile business. Since any liability of Pattillo for subsequent rental under the rent contract would be consequential damage proximately resulting from Cockrum's fraud, it follows that the two items offset each other and that trial court was right in cancelling the balance of the rent contract.

Affirmed.

Brown and Fogleman, JJ., dissent.

John A. Fogleman, Justice. I concur in all of the majority opinion except that part having to do with the

rental contract for the building and premises. The chancellor found that there was no evidence that appellee had surrendered the premises to appellant, even though he stopped paying rent sometime in 1966. As stated by the chancellor, no evidence was offered that the rent was too high or out of line with rent being charged for like buildings and premises similarly located. The only reason for cancellation of this rental contract was the statement of the trial judge that it was tainted with fraud.

The trial court and the majority have given appellee his full measure of damages for fraud. In addition, they are allowing him to have a partial rescission of the contract. That the rental contract was part of the whole contract is a matter not open to question. Thus, he has been fully compensated in damages on a recoupment and thereafter given a part of the remedy of cancellation as if he had sought rescission. Appellee had the choice of remedies.[1] He chose recoupment which entitled him only to recover damages. The rule is well stated in *Danielson* v. *Skidmore,* 125 Ark. 572, 189 S.W. 57 and quoted in *Held* v. *Mansur,* 181 Ark. 876, 28 S.W. 2d 704, where the court said:

"A person who has been induced to enter into a contract for the purchase of property by the false representations of the vendor concerning its quantity or quality may, at his election, pursue one of three remedies. First, he may cancel the contract and, by returning or offering to return the property purchased within a reasonable time, entitle himself to recover whatever he had paid upon the contract. In the second place, he may elect to retain the property and sue for the damages he has sustained by

---

[1] The general rule in regard to the effect of this election of remedies in a case like this is stated in **Lacey v. Edmunds Motor Company,** 269 Ala. 398, 113 So. 2d 507 (1959). There it was said the buyer must elect between his remedies and may not combine them.

reason of the false representations of the vendor as to the land; and in this event the measure of the damages would be the difference between the real value of the property in its true condition and the price at which he purchased it. In the third place, to avoid a circuity of actions and a multiplicity of suits, he may plead such damages in an action for 'the purchase money, and is entitled to have the same recouped against the sum he had paid for the land.''

The rental for which appellee would subsequently become liable could not in any sense of the word be consequential damages for fraudulent inducement. In the absence of evidence to the contrary, it must be assumed that the contract was for the rental value of the property. Thus, there is nothing against which liability for rent can be offset, since the appellee has been awarded the full measure of his damages under the remedy he elected.

I would modify the decree by disallowing the cancellation of the rental contract but would affirm it in all other respects.

BROWN, J., joins in this dissent.