933 F.2d 1440
 UNION NATIONAL BANK OF LITTLE ROCK, Appellant,
v.
Robert MOSBACHER, Secretary of the U.S. Department of
Commerce, Appellee.
Richard SMITH, Trustee in Bankruptcy for Leird Church
Furniture Mfg. Co., Inc., and Edward L. Kutait, Appellees,
v.
UNION NATIONAL BANK OF LITTLE ROCK, Appellant.
 No. 90-1854.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Nov. 14, 1990.
Decided May 23, 1991.
Rehearing Denied July 8, 1991.
 
 Alan C. Kohn, St. Louis, Mo., for appellant.
 Christopher O. Parker, Little Rock, Ark., for appellees, Smith and Kutait.
 George E. Maden, Washington, D.C., for appellee, Dept. of Commerce.
 Before McMILLIAN and BEAM, Circuit Judges, and ROSENBAUM,* District Judge.
 BEAM, Circuit Judge.
 
 
 1
 Union National Bank of Little Rock appeals from the district court's denial of its motion for judgment notwithstanding the verdict following a lengthy jury trial. The adverse verdicts stem from Union's action against the United States Secretary of Commerce to enforce the Secretary's guarantee on loans made by Union, and from actions brought against Union by Leird Church Furniture Manufacturing Company and Edward Kutait, Leird's sole shareholder. The Leird-Kutait complaint alleged fraud and breach of fiduciary duty.
 
 
 2
 The actions arise from mutual participation in a recovery plan, designed to resurrect Leird, pursuant to which the Secretary guaranteed loans Union made to Leird. In essence, Leird, Kutait, and the Secretary argue that Union misapplied the guaranteed loan proceeds by using them primarily to pay itself on Leird's prior indebtedness rather than for the benefit of Leird. The jury found for Leird and Kutait on their claims and awarded actual and punitive damages of $5,760,000. In addition, the jury found that the Secretary, due either to Union's misrepresentations or to its failure to comply with the terms of the loan agreements and guarantee, was not obligated on its guarantee. Union argues that Leird and Kutait did not prove fraud or breach of fiduciary duty, that lost profits cannot be recovered in a fraud action, and that Leird and Kutait failed to present a submissible case of either actual or punitive damages. Union does not appeal the merits of the judgment in favor of the Secretary. Except for our reservations about the constitutionality of punitive damages in this case, we think that the verdicts are well supported by the evidence. Accordingly, we affirm in part and remand in part.
 
 I. BACKGROUND
 
 3
 Plaintiff Leird Church Furniture Manufacturing Company started business in the early 1930's as Leird Lumber Yard. Not until 1939 did Leird become Leird Manufacturing Company, specializing in the manufacture of solid oak pews and other church furniture. Eventually, Leird's position in the church furniture market became unique; of thirty-some competitors, Leird was the sole company to produce only solid-wood furniture. Leird's annual sales placed it among the top dozen church furniture makers. At its peak, in 1975, sales reached $1,409,752, and Leird employed 112 people. Plaintiff Edward Kutait began his career with Leird in 1960 as a salesman. Several witnesses at trial characterized Kutait as a tremendous salesman, who, indeed, was successful enough to purchase Leird in 1970. Kutait was Leird's sole shareholder, and he ran the company as president until its bankruptcy in 1984.
 
 
 4
 Following Kutait's purchase of Leird in 1970, the company's sales doubled in the first year. Sales were $1,070,759 in 1973; $1,083,810 in 1974; and $1,409,752 in 1975. These peak years were due in part to sales made to the Church of Jesus Christ of Latter Day Saints. At Kutait's urging, the Mormon Church centralized its purchasing in Salt Lake City in the early 1970's and Leird became its sole supplier, with annual sales reaching $1,000,000. The Mormon account also created problems for Leird, however, for Leird's outdated factory in Little Rock at full capacity was unable to satisfy the production demands of the Mormon Church contracts. As Kutait put it: "We just had more business than we could produce."
 
 
 5
 In an effort to expand and increase production, Kutait, in February 1974, purchased the Oxford Church Manufacturing Company in Oxford, Nebraska. Kutait hoped that the Oxford plant could satisfy all orders destined for the western United States. At the same time, Leird planned to build a new factory in Little Rock. These efforts together were too much for Leird to accommodate. Kutait had trouble finding skilled wood-workers in Oxford and difficulty managing two plants. Due to its inability to meet production demands and maintain quality, Kutait closed the Oxford plant in November 1976. Meanwhile, the new Little Rock plant, scheduled to open in the winter of 1977-78, suffered numerous construction delays and problems. Start-up was difficult, and, even though the plant was out of production for several weeks that winter and construction overruns were depleting Leird's cash flow, Kutait paid all Leird employees during the shut-down. These problems were exacerbated by the loss of the Mormon account to a Canadian manufacturer in 1976. Partly in reliance on the Mormon account, Leird's once-strong sales force had declined to a fraction of its former size. Thus, sales fell to $1,250,892 in 1976 and further to $1,158,049 in 1977. Declining sales and debt incurred from construction of the new plant led to losses of $38,543 in 1977 and $214,833 in 1978. Leird never climbed out of this hole.
 
 
 6
 Financing for the new plant in Little Rock had been arranged with First American Bank, but, in 1978, Kutait refinanced these loans with Union National Bank through an initial loan of $450,000. From the beginning, Kutait and Leird dealt with Don Denton, a commercial loan officer and senior vice-president at Union. By 1980, Leird's indebtedness to Union had grown to about $600,000, and Kutait began to look for some way out. In late 1979, he became aware of the Secretary's program, administered through the Economic Development Administration (EDA), to guarantee loans for businesses hurt by foreign competition. Henry Troell at EDA testified that he first heard of Leird in February 1980 through a letter from Denton. Leird's initial inquiries were met with a summary rejection in March 1980, due to EDA's concern that Union sought merely to substitute the government's exposure for its own. Leird and Union persisted, however, and through the efforts of a consultant developed a recovery plan designed to help Leird. Under the recovery plan, which provided for $1,000,000 in working capital loans, Kutait would resign as president and concentrate on rebuilding the sales force.
 
 
 7
 No one disputes that Leird was in serious financial trouble in early 1980. Indeed, the recovery proposal, dated July 1, 1980, notes that Leird was on course to liquidation within a few months. Given these dire straits and its perception that Union still sought relief from its own exposure on Leird's indebtedness, EDA again rejected Leird's proposals. Negotiations continued, however, and in June 1980, Union introduced Roger Morin, a friend of Denton's who had done some liquidation work for Union, to Leird. Union told Kutait that Morin was a well-qualified turn-around consultant who could help Leird. When Kutait objected to Morin's help, partly because of his initial, personal dislike of Morin, who was widely characterized at trial as abusive and profane, Union told Kutait that he must either accept Morin or face liquidation, which would include calling a $300,000 personal guarantee given by Kutait's brother, Kemal Kutait. Thus, at a meeting with EDA officials on October 17, 1980, at which Leird and Union offered a further-amended recovery plan, Union presented Morin to EDA as a turn-around consultant already at Leird.
 
 
 8
 EDA was impressed by Union's commitment, which, together with Union's agreement to subordinate its security on existing loans to Leird, convinced EDA that it should fund the recovery plan. The plan, calling for a $1,000,000 working capital loan and a $600,000 fixed asset loan, was approved on March 9, 1981. Loan documents were signed on April 27, 1981, and Union made its first disbursements to Leird on April 28.
 
 
 9
 Under the approved plan, Leird was effectively controlled by Union through Denton and Morin. The amended plan--unknown to Kutait when it was presented to EDA--required Kutait to put his stock in an irrevocable voting trust, with Union to act as trustee. Moreover, under the amended plan, Kutait had no authority or responsibilities at Leird. The loan agreement expressly provided that Kutait would serve as chairman of the board for advisory purposes only, would have no direct management authority, and could not maintain offices at Leird. Union advised Kutait, who objected to these provisions, that they were required by EDA and that Kutait should accept them to close the agreement. Union promised that it would seek changes later. Thus, by these maneuvers, Morin became acting president of Leird, responsible, according to the recovery plan, to the trustee and to the board of directors, made up of Ed and Kemal Kutait, Morin, and Jim Fowler, who was Kutait's attorney. The trustee, Michael O'Brien, testified, however, that he did virtually nothing as trustee for Leird, and the Kutaits and Fowler resigned from the board of directors in December 1981 and were apparently not replaced. For all practical purposes, Union operated Leird with a free hand from April 1981 to May 1982.
 
 
 10
 Leird did not prosper under Union's control. Union spent the entire $1,000,000 working capital loan and over $100,000 of the fixed asset loan, yet sales for fiscal year 1981 declined to $755,149 (down from $1,047,921 in 1980) and Leird lost $206,431. Following the expenditure of the entire working capital loan and inquiries from EDA about compliance with the recovery plan, Union invited Kutait to return to Leird in May 1982. There, he found no employees in the office, no hourly workers in the plant, no ongoing production, no discernable sales force and only one pending order. Leird struggled on until June 1984, when it filed for bankruptcy. Charging that Union violated its trust by ignoring the terms of the recovery plan and by misapplying funds for its own benefit, Leird and Kutait brought this action.
 
 
 11
 Leird and Kutait's claims, consolidated with Union's case against the Secretary to enforce the guarantee, were tried to a jury from January 23 to February 9, 1990. The jury was instructed that it could find for Leird and Kutait on theories of fraud and breach of fiduciary duty and that it could find for the Secretary if Union made misrepresentations in its application or failed to comply with the terms of the guarantee and loan agreements. The jury found in favor of Leird, Kutait and the Secretary. It awarded Leird actual damages of $1,100,000 and punitive damages of $3,000,000. Kutait was awarded actual damages of $160,000 and punitive damages of $1,500,000. Union appeals.
 
 II. DISCUSSION
 
 12
 The district court denied Union's motion for judgment notwithstanding the verdict, finding that there was substantial evidence from which the jury could have found that Union made false and fraudulent misrepresentations to Leird, Kutait and EDA, that Morin and Denton breached a fiduciary duty to Leird and that substantial evidence supported the awards of both actual and punitive damages. While Union frames most of its arguments on appeal in terms of submissibility and focuses primarily on damages, we begin with its argument that Leird cannot recover lost profits--characterized by Union as benefit of the bargain (expectation) damages--in a fraud case based on promissory misrepresentation. The jury was instructed that if it found for Leird on the fraud claim, it could award "the value of any profits lost by the company or reasonably certain to be lost in the future." Trial Transcript at 3965. Union relies on the law of Missouri, see Heberer v. Shell Oil Co., 744 S.W.2d 441, 443-44 (Mo.1988) (en banc), and of Maryland, see Call Carl, Inc. v. BP Oil Corp., 554 F.2d 623, 630 (4th Cir.) (applying Maryland law), cert. denied, 434 U.S. 923, 98 S.Ct. 400, 54 L.Ed.2d 280 (1977), to support its argument that benefit of the bargain damages, including lost profits, cannot be recovered in a promissory-misrepresentation case in Arkansas.
 
 
 13
 To the contrary, in Cockrum v. Pattillo, 246 Ark. 594, 439 S.W.2d 632, 640 (1969), the Arkansas Supreme Court held that "[w]e do not agree ... that this court is committed to the 'out of pocket' measure of damages in fraud cases." Rather, the court held that it had expressly "recognized the so-called 'benefit of the bargain' rule of damages in fraud cases." Id. at 641, 439 S.W.2d 632. See also Thudium v. Dickson, 218 Ark. 1, 235 S.W.2d 53, 58 (1950) (measure of damages in fraud action arising from failure to supply adequate water as promised under lease same as in breach of contract action--difference between what land produced and what it would have produced if promise kept). See generally H. Brill, Arkansas Law of Damages Sec. 35-7, at 490-91 (2d ed.1990).
 
 
 14
 Given these cases, Union's argument seems to rest on a distinction between fraud cases based on misrepresentation of an existing fact and those based on a false promise made with the knowledge that it would not be kept. To the extent that Union implies that promissory misrepresentation is not actionable in fraud, see brief for appellant at 27, the cases clearly hold otherwise. See Delta School of Commerce v. Wood, 298 Ark. 195, 766 S.W.2d 424, 426 (1989) ("[A]n expression of opinion which is false and known to be false at the time it is made is actionable."); Anthony v. First Nat'l Bank, 244 Ark. 1015, 431 S.W.2d 267, 274 (1968) (action in fraud for "a false promise [made] knowing at the time it would not be kept"); Victor Broadcasting Co. v. Mahurin, 236 Ark. 196, 365 S.W.2d 265, 269 (1963) (" '[W]here one makes a false promise, knowing at the time that it will not be kept, the person injured thereby may have relief in action for fraud.' " (quoting Coleman v. Volentine, 211 Ark. 594, 201 S.W.2d 592, 594 (1947))). To the extent that Union argues merely that damages in these cases should be limited to out-of-pocket expenses, it neither cites any Arkansas authority nor gives any persuasive reasons why this should be so. Again, we think that the cases hold otherwise. See Thudium, 235 S.W.2d at 58.
 
 
 15
 As indicated, Union argues primarily that Leird and Kutait failed to present a submissible case of damages. We begin with Union's argument that Leird could not recover lost profits because of Leird's recent loss history. Put another way, Union argues that lost profits in this case were speculative. Indeed, Arkansas law is clear that lost profits must be proved with reasonable certainty. "[P]laintiff must present a reasonably complete set of figures and not leave the jury to speculate." Ishie v. Kelley, 302 Ark. 112, 788 S.W.2d 225, 226 (1990) (citation omitted). Accord Jim Halsey Co. v. Bonar, 284 Ark. 461, 683 S.W.2d 898, 903 (1985); Robertson v. Ceola, 255 Ark. 703, 501 S.W.2d 764, 766 (1973); First Serv. Corp. v. Schumacher, 16 Ark.App. 282, 702 S.W.2d 412, 414 (1985). What must be certain, however, is not a precise calculation of lost profits, but whether profits would have been made. See Jim Halsey Co., 683 S.W.2d at 903 (citation omitted) ("If it is reasonably certain that profits would have resulted had the contract been carried out, then the complaining party is entitled to recover."); American Fidelity Fire Ins. Co. v. Kennedy Bros. Constr., 282 Ark. 545, 670 S.W.2d 798, 799 (1984) ("Lost profits must be proven by evidence which makes it reasonably certain the profits would have been made."). Our review of the record convinces us that Leird met this burden.
 
 
 16
 We must first note, however, that whether we review a submissibility question under a state or federal standard has not been decided. International Art Galleries v. Kinder-Harris, Inc., 907 F.2d 864, 866 n. 2 (8th Cir.1990). When the standards are the same, we have simply avoided deciding which standard applies. Crues v. KFC Corp., 729 F.2d 1145, 1148 n. 1 (8th Cir.1984). As we indicated in International Art Galleries, 907 F.2d at 866 n. 2, the Arkansas standard on submissibility questions does not differ from the federal standard. Under Arkansas law, we must consider the evidence in the light most favorable to the appellee and affirm if substantial evidence supports the jury's verdict. Rogers v. Allis-Chalmers Credit Corp., 679 F.2d 138, 142 (8th Cir.1982) (Arkansas law); American Fidelity Fire Ins., 670 S.W.2d at 800. We do the same under federal law. See Patchell v. Red Apple Enters., 921 F.2d 157, 158 (8th Cir.1990); Kim v. Ingersoll Rand Co., 921 F.2d 197, 198 (8th Cir.1990).
 
 
 17
 Viewing the evidence in the light most favorable to Leird, we think that the jury heard substantial evidence from which it could have concluded that Leird would have again made profits had the recovery plan been carried out. The research of Keith Barry provided Leird's principal calculations of lost profits. Barry produced two different sets of figures projecting sales and net income from 1982 to 1990. See Leird Ex. 330. Assuming that Leird produced annually 150,000 linear feet of furniture by April 30, 1986, Barry calculated that sales would be $1,641,990 in 1982, $2,156,400 in 1983, $2,779,700 in 1984, and $3,465,800 in 1985. Barry testified that he arrived at his sales figures by starting from 1980 sales of $1,047,921, trial transcript at 1878-80, and calculating a steady increase each year to reach 150,000 linear feet in 1986. Id. at 3019-20. Sales figures were then calculated as price per linear foot multiplied by the number of linear feet. Using these figures, Barry projected that Leird could make a profit of $158,400 in 1986 on $4,217,850 in sales, and a profit of $434,280 in 1990 on $5,220,333 in sales. Leird Ex. 330. Barry considered his figures conservative and reasonable, trial transcript at 3022, and the jury heard evidence that Leird was capable of such production. Id. at 3046 (110,000 linear feet in 1975 at old plant); id. at 1670 (capacity of new plant was 1,500 to 1,800 linear feet per day).
 
 
 18
 The initial question, then, was whether the sales figures were realistic. To prove that they were, Barry corroborated his figures several different ways, three of which we mention. Barry calculated Leird's sales as a percentage of the total church furniture market. His figures established that during Leird's peak year in 1975, its market share was 1.3%. Trial Transcript at 3025. By comparison, under the conservative set of figures, Leird's market share would be 1 to 1.5%; under the other figures, 1 to 2%. Id. Barry also calculated market share by standard industrial classification codes. By these figures, Leird's market share in 1975 was 3.74%; Barry's projections required a market share in 1983 of 4.46%. Id. at 3030. Thus, Barry testified that "I'm not assuming a significant penetration of the market by Leird Church, I am assuming a slight increase in its market share." Id. at 3031-32. In addition, Barry calculated sales per salesman. In 1975, production of 110,000 linear feet by sixteen salesmen meant 6,875 linear feet per salesman. Id. at 3026. Barry testified that the same number of linear feet per salesman under the recovery plan would produce sales in excess of his calculations. Id. The recovery plan proposed using working capital and a more careful marketing strategy to increase Leird's sales force to twenty-eight. Id. The jury knew from the recovery plan in evidence that Leird had employed twenty sales people in 1970, but that the sales force had declined to only six in 1977. See Leird Ex. 1. Given the recovery plan's attention to developing the sales force, the jury could conclude that Barry's figures were, as he testified, reasonable. See Trial Transcript at 3026.
 
 
 19
 Following Barry, Lyle Rupert testified about his calculations of net income. Rupert started from Barry's sales figures and reviewed Leird's financial statements and statistics from competitors to arrive at the income figures contained in Leird exhibit 330. From Rupert's calculations, Leird claimed that failure to properly implement the recovery plan, in present value, resulted in lost profits of roughly $4,500,000 to $7,500,000. Id. at 3101; Leird Ex. 330.
 
 
 20
 The jury could have weighed and evaluated these figures in light of substantial evidence that the recovery plan could have worked. The jury could have considered Leird's long history and established reputation in the market, its peculiar niche procured by selling only solid-oak furniture, and testimony that Leird's principal problems were a lack of working capital and poor management--two problems which the recovery plan redressed. The jury could consider testimony that Kutait was an outstanding salesman whose talents would be better used selling furniture than running the company. Indeed, following Kutait's return to Leird in 1982, Leird regained some of the business lost from the Mormon Church. Trial Transcript at 1867-68; Leird Ex. 176. Finally, the jury could consider that EDA independently concluded that the recovery plan was feasible. Henry Troell of EDA testified: "[I]t seemed reasonable that they could increase sales if they had adequate working capital. They had the capacity to produce the furniture, assuming the recovery plan was placed into effect, and the production problems were solved.... We were convinced that Mr. Kutait could sell, and we thought they could generate enough sales to repay the loan." Trial Transcript at 2164-65. In short, the record contains evidence that Leird's problem under Kutait was not a lack of orders, but a lack of capital needed to fill them.
 
 
 21
 Against this evidence, Union offered its own expert, Charles Venus, who testified that he thought that the projected sales figures were without basis and unrealistic, that Leird's real problem was poor-quality furniture and a bad reputation, and that his own projections showed a negative cash flow and no net income. Under our standard of review, Venus's testimony merely presents a jury question. Accordingly, we hold that Leird presented a submissible case of actual damages.
 
 
 22
 Similarly, the evidence is clear that Leird and Kutait presented a submissible case of punitive damages. Under Arkansas law, punitive damages may be awarded when the evidence indicates that " 'the defendant acted wantonly in causing the injury or with such a conscious indifference to the consequences that malice might be inferred.' " James v. Bill C. Harris Constr. Co., 297 Ark. 435, 763 S.W.2d 640, 642 (1989) (quoting Freeman v. Anderson, 279 Ark. 282, 651 S.W.2d 450, 452 (1983)). Accord National By-Products v. Searcy House Moving Co., 292 Ark. 491, 731 S.W.2d 194, 195 (1987). More particularly, to show implied malice, "it must appear that the acting party either knew or had reason to believe that his action was about to inflict injury and that in spite of this knowledge he continued his course of conduct with a conscious indifference to the consequences." James, 763 S.W.2d at 642. The Arkansas Supreme Court has made clear that conscious indifference does not entail a deliberate intent to injure. " 'It is not necessary to prove that the defendant deliberately intended to injure the plaintiff. It is enough if it is shown that, indifferent to consequences, the defendant intentionally acted in such a way that the natural and probable consequence of his act was injury to the plaintiff.' " National By-Products, 731 S.W.2d at 195-96 (quoting Ellis v. Ferguson, 238 Ark. 776, 385 S.W.2d 154, 155 (1964)). The jury was properly instructed in accordance with these cases. See Trial Transcript at 3966; Arkansas Model Jury Instructions (Civil) AMI 2217 (3d ed.1989).
 
 
 23
 Union argues, however, that, as in Dews v. Halliburton Indus., 288 Ark. 532, 708 S.W.2d 67, 72 (1986), Leird and Kutait produced no more than "[a] bare allegation of fraud which results in monetary loss" not justifying punitive damages. Our review of the evidence convinces us that Leird and Kutait presented substantial evidence from which the jury could conclude that the natural and probable result of Union's acts was injury to both Leird and Kutait, and yet Union persisted in its conduct, indifferent to the consequences. In short, Union carried out the recovery plan without regard for success, and, therefore, without regard for whether its conduct would injure Leird and Kutait.
 
 
 24
 Union represented to EDA, Leird, and Kutait, for instance, that Morin was a turn-around consultant who could help Leird. See, e.g., Trial Transcript at 2145. But the jury also heard evidence from which it could conclude that Union never intended to use the recovery plan to help Leird. In a letter from Denton to his superiors at Union dated June 11, 1980, Denton wrote: "[W]e might, of course, be able to realize more through careful liquidation of the assets. I have retained Roger Morin to assist in supervising the situation." Leird Ex. 11; trial transcript at 437. Morin testified that he considered himself to be a caretaker. Trial Transcript at 931. Similarly, the jury could find that Union's claim that Morin would remain at Leird only temporarily was knowingly false. Morin remained at Leird as acting president for over one year, as Union's representative for two years. When the board of directors through Kutait actually hired a permanent president, Harold Braswell, to replace Morin (as the recovery plan called for, and as Denton encouraged), Denton told Braswell that "Roger Morin was there to stay, that he was the bank's man, and he was there to stay." Id. at 963. Morin told Braswell that Leird could be sold and that he should not buy a house in Little Rock. Id. at 965. And in a letter to Denton dated August 7, 1981, Morin stated: "At your request, I have not actively sought any further candidates for the position of President." Union Ex. 122; trial transcript at 446. Finally, Morin left Leird only after the entire working capital loan had been disbursed. Trial Transcript at 2320-21. The jury could reasonably have concluded that Union never intended that Morin's tenure at Leird would be only temporary.
 
 
 25
 Just as Union failed to replace Morin with a permanent president, so did Union fail to properly employ the trustee. While Morin acknowledged that he worked for the trustee, id. at 506, the trustee, O'Brien, testified that he never gave any directions to Morin and did not expect that Morin would report to him. Id. at 2964, 2975. He made no daily decisions for Leird, did not approve any expenses, and never handled any funds. Id. at 2961, 2971, 2975. Indeed, O'Brien testified that he did not even know of the recovery plan. Id. at 2964.
 
 
 26
 The jury also could have found that Union paid no regard to the consequences of its actions by the way it spent the working capital loan. One witness testified that of $1,000,000 in working capital funds, $672,000 was used for non-income producing assets. Id. at 3217. For example, Union directed that $250,000 be placed in an interest-bearing account at the bank. While the account paid 9 or 9.5% interest, Leird was paying 14.5% interest on the loan; Union thus earned $37,366.77 at Leird's expense. Id. at 344, 370. Of the first working-capital disbursement, Union made substantial principal and interest payments to itself. Id. at 307-08. Through Leird, Union also paid Morin $10,000 per month as salary, id. at 357, even though the loan agreements capped the president's annual salary at $50,000, and EDA twice declined to waive that restriction. Trial Transcript 2187, 2188; Leird Ex. 118. Moreover, Union did not comply with the terms of the loan agreements requiring that all disbursement requests be made in writing. Instead, Denton himself prepared back-dated requests and had them typed at the bank (not even on Leird letterhead) for Morin's signature. Trial Transcript at 324-27. Several witnesses testified that Union did not comply with the terms of the guarantee or the loan agreements. See, e.g., id. at 3218-19; 3371-75.
 
 
 27
 By this pattern of disbursements, of which we have cited only a few examples, despite $1,000,000 in capital funds spent by Leird in fiscal 1982, capital assets actually decreased by $250,000. Id. at 3305-06. Put in other terms, one witness testified that through its use of the working capital funds, Union reduced its own exposure on Leird's indebtedness by $691,537.81, or by 92%. Id. at 365-66. As another put it, "[I]t is almost as if the lifeblood of the company was being drained from its veins." Id. at 3218. We think that from this sort of evidence the jury could conclude that Union did not make a serious attempt to implement the recovery plan with Leird's well-being in mind. Indeed, the jury could conclude that Union acted solely in its own interests, without regard for injury it might cause to Leird and Kutait. Accordingly, Leird and Kutait presented a submissible case of punitive damages.
 
 
 28
 Finally, however, we are troubled by Union's argument that the award of punitive damages in this case violates due process.[1] Since this case was submitted, the Supreme Court has decided Pacific Mut. Life Ins. Co. v. Haslip, --- U.S. ----, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991), in which it considered whether an award of punitive damages under Alabama law violated the defendant's due process rights. The Court held that it could not say "that the common-law method for assessing punitive damages is so inherently unfair as to deny due process and be per se unconstitutional." Haslip, 111 S.Ct. at 1043. Nevertheless, the Court declined to say that the award of punitive damages is never unconstitutional. Id. Thus, the Court considered the award under Alabama law.
 
 
 29
 In finding no constitutional violation, the Supreme Court considered the following factors significant: (1) the jury was instructed that the purpose of punitive damages was to punish the defendant and to deter similar conduct so that its discretion was not unlimited; (2) the Alabama Supreme Court has established post-trial procedures for scrutinizing punitive awards, enumerating certain factors for the trial court to consider in reviewing a verdict for excessiveness; (3) the Alabama Supreme Court also reviews an award by applying "detailed substantive standards" to ensure that the award is reasonable in amount and rational in light of its purpose. Id. at 1044-45. The Supreme Court concluded that "[t]he application of these standards ... imposes a sufficiently definite and meaningful constraint on the discretion of Alabama fact finders in awarding punitive damages." Id. at 1045.[2]
 
 
 30
 Although the Arkansas Supreme Court reviews punitive damage awards to determine whether the award shocks the conscience of the court or is so great that it must be the product of passion or prejudice, see, e.g., O'Neal Ford v. Davie, 299 Ark. 45, 770 S.W.2d 656, 659 (1989); First Commercial Bank v. Kremer, 292 Ark. 82, 728 S.W.2d 172, 177 (1987), the Arkansas Supreme Court has also noted that "[c]onsiderable discretion is given to the jury in fixing punitive damages in an amount it deems appropriate to the circumstances." Walt Bennett Ford v. Keck, 298 Ark. 424, 768 S.W.2d 28, 31 (1989). Thus, Arkansas juries are apparently told little more than defendant's net worth and that punitive damages serve to punish and to deter. See, e.g., Matthews v. Rodgers, 279 Ark. 328, 651 S.W.2d 453, 458 (1983). From our cursory review, we are not certain that Arkansas law provides standards which impose "a sufficiently definite and meaningful constraint on the discretion" of the jury. See Haslip, 111 S.Ct. at 1045. Because Haslip was decided after submission of this case, however, we think that careful consideration of the due process argument would best be furthered by remanding this case to the district court. Cf. Robertson Oil Co. v. Phillips Petroleum Co., 930 F.2d 1342, 1347 (8th Cir.1991).
 
 III. CONCLUSION
 
 31
 Union does not challenge the merits of the verdict in favor of the Secretary. Brief for Appellant at 6 n. 6. Rather, it argues that the district court lacked removal jurisdiction, that the Secretary was not entitled to a jury trial, and that its case against the Secretary should not have been consolidated with Leird and Kutait's claims. We have carefully considered these arguments, as well as Union's other arguments on appeal, and find them to be without merit. Accordingly, the judgment of the district court is affirmed in part. We remand the case, however, solely for the district court to determine whether, in light of Haslip, the award of punitive damages in this case violated Union's due process rights under the United States Constitution.
 
 
 
 *
 The HONORABLE JAMES M. ROSENBAUM, United States District Judge for the District of Minnesota, sitting by designation
 
 
 [1]
 Union has not argued on appeal that the award of punitive damages is excessive, and, at oral argument, Union stated that it did not make a motion for a remittitur or new trial to the district court. Instead, Union argued in its motion for judgment notwithstanding the verdict only that there was no evidence from which the jury could find that Union acted with malice, and, thus, that Leird and Kutait did not make a submissible case of punitive damages. In addition, Union's motion contains one sentence, that "the punitive damage awards deprived Union of its rights under the due process clause of the United States Constitution." On appeal, Union renews its submissibility arguments, and slightly expands its due process argument. Since Union did not raise the issue of excessiveness below and does not raise it here, we do not address it. See Total Petroleum v. Davis, 788 F.2d 476, 483 (8th Cir.1986)
 
 
 [2]
 Just prior to Haslip, we applied a similar analysis to conclude that an award of punitive damages under South Dakota law did not violate due process. See Davis v. Merrill Lynch, Pierce, Fenner & Smith, 906 F.2d 1206, 1226-29 (8th Cir.1990). In Davis, we noted that South Dakota juries must consider five specific factors in awarding punitive damages, and that the award is subject to review in both the trial court and the state supreme court. Both courts independently apply the same factors on review. Id. at 1227. Thus, we found that South Dakota juries were not given standardless discretion. Id. at 1227-28